

Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

## OPINION

No. 04-07-00384-CV

**ALAMO COMMUNITY COLLEGE DISTRICT**,
Appellant/Cross-Appellee

v.

Dr. William **MILLER**,
Appellee/Cross-Appellant

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2005-CI-19991
Honorable Michael Peden, Judge Presiding

Opinion by:    Catherine Stone, Justice

Sitting:    Alma L. López, Chief Justice
Catherine Stone, Justice
Sandee Bryan Marion, Justice

Delivered and Filed:    October 15, 2008

AFFIRMED

This case concerns Alamo Community College District's breach of a settlement agreement with a tenured San Antonio College professor, Dr. William Miller, following Miller's termination from his employment. The trial court awarded Miller $487,237.57 in damages and ordered the Alamo Community College District ("ACCD") to reinstate Miller to his position at the college ("SAC"). Both ACCD and Miller appeal the trial court's judgment. We affirm the trial court's judgment in all respects.

## MILLER'S TERMINATION

Miller joined SAC's faculty in 1965 and eventually became a tenured chemistry professor. In 1996, when Miller was working in SAC's Distance Education Department, a female coworker, Rosario Duque, accused Miller of engaging in inappropriate sexual conduct. Miller's conduct caused Duque to feel depressed and miss work, and she decided to report Miller to SAC's executive vice president, Robert Zeigler.[1] Although Duque reported Miller's conduct to Ziegler, Duque asked Zeigler not to confront Miller about her allegations. Zeigler honored Duque's request, but reassigned Miller and Duque to positions elsewhere within SAC.

After Miller was reassigned to SAC's Chemistry Department, Cynthia Bello, one of Miller's female coworkers, accused Miller of engaging in inappropriate sexual behavior in 2001. Bello stated Miller's behavior made her miss work because she did not want to have contact with Miller. Bello reported Miller's behavior to her superiors, and Ziegler and Vern Loland, SAC's president at the time, initiated an investigation into the matter. Upon the conclusion of Ziegler and Loland's investigation, Miller was given the opportunity to retire from his position at SAC. When Miller refused to retire by the deadline provided to him, ACCD terminated Miller for his improper sexual behavior during the course of his employment.

## THE SETTLEMENT AGREEMENT

Miller filed suit in federal court, alleging ACCD terminated him from SAC without due process. Miller and ACCD reached a settlement agreement, agreeing that Miller would be given an opportunity to challenge his dismissal before a faculty hearing panel as required by district policy. The parties' agreement provided:

---

[1] Zeigler became SAC's president in 2002.

2. The Faculty Hearing Panel provided for in the ACCD Policy DMB (Local) of the Alamo Community College District will . . . hear, consider, and determine the challenge of Dr. Miller to his dismissal and will determine whether there was good cause for that dismissal pursuant to the panel hearing process detailed in ACCD Policy DMB (Local).

3. The findings and decision of the Faculty Hearing Panel to affirm or deny the termination will be forwarded to the Board of Trustees of ACCD for its review.

4. The Board will review the determination and findings of the panel pursuant to the substantial evidence rule as it is applied in *Montgomery ISD v. Davis*, 34 S.W.3d 559 (Tex. 2000), and *Hale v. Fort Worth ISD*, 2002 WL 1377933 (Tex. App.—Austin, 2002) and Board Policy DMB (Local); the Board will be bound by such Panel determination if supported by substantial evidence; the parties agree that the Board will be advised by and bound by the determination of retired Texas district judge, Judge James Meyers, whether there is substantial evidence to support the Panel determination. During its review, the Board may, under its Board Policy DMB (Local), return the matter to the Panel for further consideration of issues stated by the Board in writing, which require a determination and on which the Panel did not make a determination.

5. It is stipulated that in the event that the Panel determines that Dr. Miller's termination was without good cause and decides that the termination should be denied, and that determination is supported by substantial evidence, then Dr. Miller will be paid the sum of . . . ($487,237.57) by [ACCD] in full and final settlement of his claims within . . . (14) days of the Board concluding that the Panel determination is supported by substantial evidence and Dr. Miller will thereupon be reinstated to his former position as a tenured professor of chemistry at [SAC].

The agreement also provided that ACCD would pay Miller $150,000 for attorney's fees and that Miller would waive his right to sue ACCD for any reason related to his termination, except for a breach of the parties' settlement agreement.

## THE FACULTY HEARING PANEL

A faculty hearing panel was convened pursuant to the terms of the parties' settlement agreement. Following the testimony of Miller's accusers, Bello and Duque, the Faculty Hearing Panel issued its "findings, conclusions, and recommendations concerning the termination of [Miller]." The Faculty Hearing Panel found problems with the manner in which ACCD handled

Duque's and Bello's complaints. The Faculty Hearing Panel noted ACCD failed to pursue an investigation of Duque's complaint after she accused Miller of misconduct and never informed Miller about Duque's accusations. With respect to Bello's complaint, the Faculty Hearing Panel noted that in cases such as Bello's, a team of one man and one woman, one of whom must be a faculty member, is required to carry out the investigation and to prepare a written report regarding the team's findings. The Faculty Hearing Panel found that no written report was prepared as to Bello's complaint and that ACCD improperly allowed a team consisting of two females, neither of whom were faculty members, to investigate Bello's complaint.

The Faculty Hearing Panel concluded ACCD had failed to follow its own policies in terminating Miller. The Faculty Hearing Panel also concluded that Miller's conduct constituted "inappropriate behavior" in violation of ACCD's sexual harassment policy (Policy DHA (Local)) because his "actions created hostile and adverse employment environments and caused suffering to the employees in question." Although the Faculty Hearing Panel found Miller's conduct constituted a violation of ACCD's sexual harassment policy, it concluded Miller's actions did not constitute grounds for termination under such policy or constitute grounds for termination under ACCD's tenured faculty termination policy (Policy DMB (Local)).[2] Based on its findings and conclusions, the Faculty Hearing Panel determined there was insufficient cause to terminate Miller. The panel nevertheless urged "Miller [to] retire immediately."

Pursuant to the parties' settlement agreement, Judge Meyers reviewed the Faculty Hearing Panel's findings and determination and concluded the Panel's findings and determination were supported by substantial evidence. Upon receiving Judge Meyers's determination, ACCD's Board

---

[2] The faculty hearing panel stated Miller's conduct did not rise to the level of moral turpitude as contemplated by ACCD's tenured faculty termination policy.

of Trustees voted to return Miller's case to the Faculty Hearing Panel because the Board was concerned that the Panel did not properly apply ACCD's sexual harassment policy in reaching its decision. The Board of Trustees instructed the Faculty Hearing Panel to reassess its application of ACCD's sexual harassment policy (Policy DHA (Local)) and to resubmit its recommendation to the Board.

In response to the Board of Trustees's request, the Faculty Hearing Panel reconvened and voted to stand by its earlier findings and determination. The Faculty Hearing Panel further advised the Board of Trustees as follows:

a. Policy DHA (Local), page 2, paragraph 4, states, "If the complaint is against a faculty member, the investigative team shall include at least one faculty member." The 2001 team investigating the complaint against Dr. Miller included the ACCD Director of Human Resources and another Human Resources employee, neither of which was a faculty member.

b. Policy DHA (Local), page 2, paragraph 4, states, "All teams shall consist of at least one male and one female investigator." The 2001 team investigating the complaint against Dr. Miller consisted of two females.

c. Policy DHA (Local), page 2, paragraph 5, states, "The investigative team shall . . . submit a written decision of findings to the appropriate College President or Chancellor, or designee." The committee requested, but was not presented with, a written investigative report of [Bello's] complaint. In fact, no one involved in this case was able to determine if the 2001 investigative team even wrote a "decision of findings."

d. Policy DHA (Local), page 3, paragraph 7, states, "Where the disposition recommends an adverse action against an employee, the protections and requirements of the ACCD Academic and Freedom and Tenure Policy and the Grievance Policy shall apply." This statement requires that Policy DMB (Local), Termination of Employment: Tenure, be followed.

e. Policy DMB (Local), page 1, states, "Adequate cause for the dismissal of a faculty member with tenure shall include professional incompetence, moral turpitude or gross neglect of professional responsibilities." Since Dr. Miller's professional performance was not being challenged, the committee considered the question of moral turpitude. While considered reprehensible and definitely not condoned by the

committee, we concluded that Dr. Miller's behavior did not rise to the level of moral turpitude.

The Board of Trustees subsequently reviewed all of the Faculty Hearing Panel's findings and its final determination. The Board determined that "while the fact findings of the panel at San Antonio College District are supported by substantial evidence, the panel exceeded the scope of its authority in determining the issues of College Policy." The Board of Trustees concluded that "[w]hen the panel's fact findings are applied to the proper interpretation of Board-approved College Policy, then the decision to terminate Dr. Miller should be upheld."

## THE BREACH OF CONTRACT SUIT

Miller filed suit against ACCD in federal court following the Board of Trustees's decision to uphold his termination, for, among other things, breach of the parties' 2005 settlement agreement. The district court dismissed Miller's claims, explaining that Miller's breach of settlement claim belonged in state court, while Miller's other claims were barred by the terms of the parties' settlement agreement. Miller subsequently refiled his breach of settlement claim against ACCD in state court, seeking an order of reinstatement, stipulated damages in the amount of $487,237.57, two years additional salary and benefits, and attorney's fees.[3]

Both Miller and ACCD moved for summary judgment on the issue of whether ACCD had breached the parties' 2005 settlement agreement. The trial court granted summary judgment in Miller's favor and denied ACCD's summary judgment motion. Miller next moved for a final summary judgment. The trial court granted Miller's motion with respect to his request for

---

[3] The record reveals that after Miller filed his suit in state court, ACCD amended its tenured faculty termination policy (Policy DMB (Local)) to expressly allow for termination for an act constituting sexual harassment. Policy DMB (Local) now provides: "Adequate cause for the dismissal of a faculty member with tenure shall include professional incompetence, moral turpitude, gross neglect of professional responsibilities, and sexual harassment . . . ."

reinstatement and $487,237.57 in stipulated damages. However, the trial court denied Miller's motion with respect to his request for two years additional salary and benefits and attorney's fees. The trial court later considered, and granted, ACCD's motion for summary judgment on Miller's attorney fee's claim.

The trial court proceeded to conduct a bench trial on Miller's request for additional salary and benefits for the 2005-06 and 2006-07 academic years. The trial court awarded Miller zero damages on his claim, and the court entered a final judgment ordering Miller's reinstatement and awarding Miller $487,237.57 in stipulated damages. The trial court issued findings of fact and conclusions of law following its ruling. Both Miller and ACCD appeal the trial court's judgment.

## ACCD'S APPEAL

Both parties agree that this is a contract interpretation case concerning the interpretation of the terms of the parties' 2005 settlement agreement. ACCD argues on appeal that we must reverse the district court's judgment reinstating Miller and awarding him damages because the parties' settlement agreement authorized ACCD's Board of Trustees to reject the Faculty Hearing Panel's determination and conclude that Miller's conduct warranted his termination from SAC. According to ACCD, the parties incorporated case law into their settlement agreement explaining that school boards are responsible for both interpreting district policy and making the ultimate decision about whether or not the facts demonstrate a faculty member has violated district policy. By contrast, Miller argues the parties expressly agreed in their settlement agreement that the Faculty Hearing Panel would be responsible for both interpreting district policy and deciding whether the facts demonstrate he violated the policy of ACCD. Miller further claims that, pursuant to the terms of the parties' settlement agreement, once Judge Meyers concluded there was substantial evidence to

support the Panel's determination to reinstate him, the Board of Trustees was bound to follow the Faculty Hearing Panel's decision regardless of the Board's views on the proper application of district policy. We agree with Miller.

We construe settlement agreements according to the rules applicable to contract interpretation. *Cities of Abilene, San Angelo, & Vernon v. Public Util. Comm'n*, 146 S.W.3d 742, 747 (Tex. App.—Austin 2004, no pet.). In construing a written contract, we must ascertain and give effect to the parties' intentions as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We examine and consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Id.*

Although ACCD argues that the terms of the parties' 2005 settlement agreement vested its Board of Trustees with the power to decide any policy issues associated with Miller's termination, we cannot interpret the settlement agreement in the manner suggested by ACCD because the terms of the settlement indicate otherwise. As previously noted, the parties' settlement agreement provides:

> 2. The Faculty Hearing Panel provided for in the ACCD Policy DMB (Local) of the Alamo Community College District will . . . hear, consider, and determine the challenge of Dr. Miller to his dismissal and will determine whether there was good cause for that dismissal pursuant to the panel hearing process detailed in ACCD Policy DMB (Local).
>
> 3. The findings and decision of the Faculty Hearing Panel to affirm or deny the termination will be forwarded to the Board of Trustees of ACCD for its review.
>
> 4. The Board will review the determination and findings of the panel pursuant to the substantial evidence rule as it is applied in *Montgomery ISD v. Davis*, 34 S.W.3d 559 (Tex. 2000), and *Hale v. Fort Worth ISD*, 2002 WL 1377933 (Tex. App.—Austin, 2002) and Board Policy DMB (Local); the Board will be bound by such Panel determination if supported by substantial evidence; the parties agree that the Board

will be advised by and bound by the determination of retired Texas district judge, Judge James Meyers, whether there is substantial evidence to support the Panel determination. During its review, the Board may, under its Board Policy DMB (Local), return the matter to the Panel for further consideration of issues stated by the Board in writing, which require a determination and on which the Panel did not make a determination.

5. It is stipulated that in the event that the Panel determines that Dr. Miller's termination was without good cause and decides that the termination should be denied, and that determination is supported by substantial evidence, then Dr. Miller will be paid the sum of . . . ($487,237.57) by [ACCD] in full and final settlement of his claims within . . . (14) days of the Board concluding that the Panel determination is supported by substantial evidence and Dr. Miller will thereupon be reinstated to his former position as a tenured professor of chemistry at [SAC].

The plain terms of the settlement agreement establish that the Faculty Hearing Panel would not only make factual findings, but would also make a determination about whether to terminate Miller for a violation of district policy. The parties' agreement further states that the Board of Trustees agreed to be bound by such determination if its advisor, Judge Meyers, concluded substantial evidence supported the Panel's determination. From the plain language of the parties' agreement, we must conclude that the Board of Trustees agreed as part of its settlement with Miller to divest itself of its right to decide any policy issues associated with Miller's termination. Thus, once Judge Meyers concluded the Faculty Hearing Panel's determination was supported by substantial evidence, ACCD's Board of Trustees had no authority to reject the Panel's decision to reinstate Miller. ACCD is bound by its agreement as written, and it cannot rewrite the agreement to change its terms. *See Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.) ("[P]arties strike the deal they choose to strike and, thus, voluntarily bind themselves in the manner they choose. And, that is why parties are bound by their agreement as written.").

ACCD asserts its Board of Trustees was authorized to reject the Faculty Hearing Panel's determination concerning Miller because *Montgomery Independent School District v. Davis*,

34 S.W.3d 559, 560 (Tex. 2000), whose principles it believes were fully incorporated into the parties' settlement agreement, holds that school boards are solely responsible for interpreting district policy and making the ultimate decision about whether a faculty member has violated district policy. In *Davis*, the supreme court considered the termination of a public school teacher under Texas Education Code chapter 21, subchapter F, specifically, section 21.259.[4] There, a teacher was terminated for allegedly violating district policy by failing to maintain an effective working relationship and good rapport with parents, the community, and colleagues. 34 S.W.3d at 561. The school district appointed an independent hearing examiner to conduct an evidentiary hearing and make findings of fact, conclusions of law, and recommendations regarding the teacher's termination. *Id.* The hearing examiner found that there were no grounds for the school district to terminate the teacher, but after considering the hearing examiner's findings and determinations, the school district board made its own evidentiary findings tending to support a conclusion that the teacher had violated district policy and voted to terminate the teacher. *Id.* The school board's decision, which was affirmed by the Commissioner of Education, was reversed by the trial court. *Id.* The court of appeals affirmed the trial court's judgment. *Id.* at 562.

On appeal to the supreme court, the school board argued that it was entitled to make the ultimate determination as to whether the teacher had failed to maintain effective working relationships and good rapport because such determination involved interpreting district policy. *Id.* at 563. The school board further argued that the board's statutory powers allowed it to make additional fact findings. *Id.* The teacher argued on appeal that the board was bound by the hearing examiner's finding that she did not fail to maintain effective relationships or good rapport with

---

[4] It is undisputed by the parties that the provisions of the Education Code discussed in *Davis*, which refer to public schools, do not expressly apply to this case.

parents, the community, and colleagues because such finding was supported by substantial evidence. *Id.* at 564. She also argued the board did not have the statutory authority to make additional fact findings. *Id.*

First, the supreme court rejected the school board's contention that it was authorized to make additional findings of fact. The court stated that "[i]f a board could find additional facts, resolving conflicts in the evidence and credibility disputes, it would then be serving as its own factfinder despite delegating the factfinding role to a hearing examiner, and the process of using an independent fact-finder would be meaningless." *Id.* The court recognized that when a school board reviews the facts of the case, section 21.259 of the Education Code limits school boards to conducting a substantial evidence review, *id.* at 565, which the court stated is "a limited standard of review, requiring 'only more than a mere scintilla,' to support an agency's determination." *Id.* at 566 (citation omitted).

Second, the court determined that because school boards retain the authority to make the ultimate decision of whether the facts demonstrate board policy was violated, school boards may, under section 21.259 of the Education Code, reject or change a hearing examiner's conclusions of law or the examiner's proposal for relief so long as the board's decision is supported by substantial evidence and free from legal error. *Id.* at 564-66. The court stated:

> We do not suggest that a school board must simply accept an examiner's recommendation; under section 21.259(b)(1), the board may reject or change conclusions of law or the proposal for relief. The ability to reject or change conclusions of law preserves a school board's authority and responsibility to interpret its policies. The board has the power to apply those policies to the examiners' findings and the undisputed evidence by rejecting or changing the examiner's conclusions of law or proposal for relief . . . . We emphasize, however, that while an independent factfinder decides the facts under subchapter F [of the Education Code], the Board retains the authority to make the ultimate decision of whether the facts demonstrate that board policy was violated . . . Because school boards have "the

exclusive power and duty to govern and oversee the management of the public schools of the district," TEX. EDUC. CODE ANN. § 11.151(b), under the statutory scheme a school board must be the ultimate interpreter of its policy, subject to the limits established by the Legislature in its provisions for administrative and judicial review.

*Id.* at 564-65. The court further explained:

[A] school board is entitled to adopt, reject, or change a hearing examiner's conclusions of law, and make the ultimate decision of whether to renew a particular contract, so long as the school board's decision is supported by substantial evidence and free from legal error. Thus, the label attached, "finding of fact" or "conclusion of law," is not determinative, the focus is on whether the issue determined is ultimately one of policy, and if so, whether a school board's decision is supported by substantial evidence and free of erroneous legal conclusions.

*Id.* at 566 (citations omitted). Upon reviewing the facts, the supreme court determined the school board's decision to terminate the teacher was not supported by substantial evidence. *Id.* at 566-67. The court thus affirmed the judgment of the court of appeals. *Id.* at 560.

Although ACCD argues the parties' settlement agreement incorporated all of the legal principles discussed in *Davis*, we believe it would be unreasonable to read the parties' settlement agreement in such a manner. The settlement agreement specifically limits the parties' reliance on *Davis* to its discussion and application of the substantial evidence standard, and includes no language suggesting the parties intended for *Davis's* discussion of subchapter F to apply to Miller's case. We cannot interpret the settlement agreement in the manner suggested by ACCD without effectively nullifying other provisions within the agreement. For example, the provisions within the parties' settlement agreement stating "the Board will be bound by such panel determination if supported by substantial evidence" and "the parties agree the Board will be advised by and bound by the determination of retired Texas district judge, Judge James Meyers, whether there is substantial evidence to support the panel determination" are rendered meaningless if the Board of Trustees

retained authority to reject the Faculty Hearing Panel's determination as claimed by ACCD. The supreme court has instructed us "to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless," *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); therefore, we must reject ACCD's contention on appeal.

We likewise reject ACCD's contention that it would never have consented in the settlement agreement to relinquish all of its authority regarding policy interpretation and application because such an agreement would have rendered ACCD's role meaningless in the review process. We emphasize that the agreement was in settlement of a federal lawsuit. It is not uncommon in the context of a settlement for parties to delegate to other entities the role of finding facts and rendering decisions based upon those facts. That is, in essence, what parties do when they agree to submit contested cases to mediation or arbitration. In the instant case, ACCD agreed to submit to the Faculty Hearing Panel the duty to "hear, consider, and determine the challenge of Dr. Miller to his dismissal . . . ." As an additional safeguard to check the findings and determination of the Faculty Hearing Panel, the parties agreed that Judge Meyers would review the Panel's determination for supporting substantial evidence, and that ACCD would be bound by Judge Meyers's determination. In short, the agreement in this case is procedurally similar to an agreement to submit a dispute to arbitration, with an additional protective layer of review provided by Judge Meyers's role in the process. This is the procedural bargain struck by the parties in settling Miller's federal suit. Accordingly, we overrule ACCD's appellate complaint.

## MILLER'S CROSS APPEAL

In his cross appeal, Miller challenges the trial court's conclusion that his failure to mitigate his damages bars him from recovering two additional years of lost wages and benefits. We review

a trial court's conclusions of law to determine their correctness based upon the facts. *Citizens Nat'l Bank v. City of Rhome,* 201 S.W.3d 254, 256 (Tex. App.—Fort Worth 2006, no pet.). A trial court's conclusions of law are reviewed *de novo*, *see State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996), and we will not reverse them unless they are erroneous as a matter of law. *Tex. Dep't of Public Safety v. Stockton*, 53 S.W.3d 421, 423 (Tex. App.—San Antonio 2001, pet. denied).

In Texas, a wrongfully discharged employee must exercise reasonable diligence to mitigate damages by pursuing other employment, *Gorges Foodservice, Inc. v. Huerta*, 964 S.W.2d 656, 669 (Tex. App.—Corpus Christi 1997, pet. withdrawn), or else the employee is barred from recovering those losses that could have been avoided. *Pinson v. Red Arrow Freight Lines, Inc.*, 801 S.W.2d 14, 15 (Tex. App.—Austin 1990, no writ). The duty to mitigate damages arises only if it can be done with "'trifling expense or with reasonable exertions.'" *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999) (quoting *Walker v. Salt Flat Water Co.*, 128 Tex. 140, 96 S.W.2d 231, 232 (1936)). The burden is on the defendant to show that an employee did not use ordinary care in reducing or avoiding his damages. *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 224 (Tex. App.—San Antonio 1999, no pet.).

Here, the record from the bench trial on Miller's claim for additional lost wages and benefits shows that while Miller was prepared to return to work following the Faculty Hearing Panel's decision, ACCD did not allow him to return to work. As a result of ACCD's decision not to reinstate him, Miller lost wages and benefits for the 2005-06 and 2006-07 academic years. The record shows that had ACCD allowed Miller to return to work, he would have received $123,708 in wages and benefits for the 2005-06 academic year and $128,834 in wages and benefits for the 2006-07 academic year.

At trial, Miller admitted that following the Board of Trustee's decision, he made no attempt to secure a teaching position substantially similar to the one he held at SAC. He did testify, however, that he searched the classified ads for teaching positions following his termination. Miller stated that he earned $12,582.70 working for a friend's construction company during the 2005-06 academic year. Miller further testified Schreiner University contacted him to teach part-time during the 2006-07 academic year and that he earned $13,333.00 through such employment.

Miller's employment expert, Merrill Jones, testified that allegations of sexual harassment would be a "major red flag" to a prospective employer. Jones stated that an allegation of sexual harassment is "very stigmatizing" because employers generally take "a zero tolerance to sexual harassment." He noted colleges will typically search the internet for information about a potential employee. Jones stated that when he searched the internet for information on Miller, reports of Miller's sexual harassment were readily available.

Zeigler also testified at trial. Zeigler testified that an allegation of sexual harassment would be a "red flag" if he were considering a job applicant. He testified that an allegation of sexual harassment is a "serious charge," and that Miller's termination for sexual harassment "would make employment difficult" for him. Zeigler agreed that Miller's termination for sexual harassment "substantially foreclosed other comparable employment opportunities" for Miller.[5]

Following a bench trial, the trial court denied Miller's claim for two years of additional wages and benefits. The court entered the following findings of fact and conclusions of law in support of its ruling:

---

[5] The Director of Human Resources also agreed at trial that Miller's termination for sexual harassment would likely foreclose employment opportunities for Miller.

Findings of Fact

2.   From the time of his termination in the spring of 2001 until the time of trial, Miller made no effort to seek employment substantially similar to his position with ACCD.

3.   In Miller's case, substantially similar employment would have included a teaching position at a public or private secondary school or institution of higher education.

4.   With an exception noted below, Miller's only employment since the spring of 2001 has consisted of jobs building retaining walls and boat docks, sodding yards, moving equipment, and building bathrooms.

***

6.   This employment was not actively sought by Miller, but was offered to him without substantial effort on his part.

7.   This employment was not substantially similar to Miller's job with ACCD.

8.   In August 2006, Miller began teaching part-time at Schreiner University.

9.   Miller did not seek this position; the university contacted him.

10.   In light of its part-time nature, this employment was not substantially similar to Miller's job with ACCD.

11.   Miller has failed to exercise reasonable diligence to seek and maintain employment substantially similar to his job with ACCD.

12.   Miller has failed to prove that he could not have secured other employment through reasonable diligence.

13.   Miller has failed to prove the amounts he might have earned through the exercise of reasonable diligence.

***

Conclusions of Law

1.   A terminated employee has a duty, for a reasonable time after his discharge, to seek and accept employment substantially similar to his previous job.

2.      After a reasonable time and a reasonable and diligent effort, a terminated employee who has been unable to obtain substantially similar employment has a duty to seek and accept any work for which he is qualified.

3.      If a terminated employee fails to exercise reasonable diligence to mitigate his damages, any amounts he might have earned through such diligence must be offset against the damages resulting from his termination.

4.      Once a terminated employee's failure to exercise reasonable diligence has been established by the employer, the burden shifts to the employee to show the amounts he could have earned through the exercise of reasonable diligence.

5.      Miller's failure to exercise reasonable diligence and his failure to prove whether he could have obtained other employment through the exercise of reasonable diligence and the amounts he could have earned through such exercise constitute a failure to mitigate damages, which bars his recovery of damages beyond the stipulated damage[s] set forth in the parties' Settlement Agreement dated April 13, 2005.

Miller requested additional findings of fact and amended conclusions of law from the trial court. The trial court made the following additional findings of fact and amended conclusions of law:

## Additional Findings of Fact

1.      The newspaper articles reporting that Dr. Miller had been terminated by ACCD based on allegations of sexual harassment made any attempts by Dr. Miller to seek same or similar employment virtually impossible.

2.      ACCD's termination of Dr. Miller based on allegations of sexual harassment and the publicity of the sexual harassment allegations has foreclosed other comparable employment opportunities for Dr. Miller.

3.      If ACCD had reinstated Dr. Miller for the 2005-2006 academic year, which includes summer employment, Dr. Miller's salary and benefits would have totaled $123,708.49.

4.      If ACCD had reinstated Dr. Miller for the 2006-2007 academic year, which includes summer employment, Dr. Miller's salary and benefits would have totaled $128,833.75.

***

## Amended Conclusions of Law

1. Because failure to mitigate is an affirmative defense, the employer bears the burden of proving lack of diligence on the part of the employee and the amount by which the employee's damages were increased by his failure to mitigate.

2. The general rule as to the correct measure of damages for wrongful discharge of an employee is the present cash value of the contract to the employee if it had not been breached, less any amounts that the employee should, through the exercise of reasonable diligence, have been able to earn through other employment.

After reviewing the fact findings and conclusions of law made by the trial court, we believe the trial court correctly concluded that Miller cannot recover additional lost wages and benefits for the 2005-06 and 2006-07 academic years due to his failure to mitigate his damages. The trial court recognized that Miller was obligated to "seek and accept any work for which he [wa]s qualified" once it was determined that he could not secure employment substantially similar to his position with SAC. *See Kramer v. Wolf Cigar Stores Co.*, 99 Tex. 597, 91 S.W. 775, 777 (1906) (holding terminated employee has a duty, at least for a reasonable time after his or her discharge, to seek employment comparable to his or her previous job; however, after that time, employee is obligated to seek and accept any work for which he or she is qualified). Although the trial court found Miller took positions working construction and teaching part-time, the court determined Miller nonetheless failed to exercise reasonable diligence following his termination. The record supports the trial court's conclusion, as the record indicates that Miller did not actively seek any employment opportunities following his termination from SAC. The record shows Miller's friend gave him his position working construction, while Schreiner University contacted him about its open part-time teaching position. Given Miller's lack of reasonable diligence to secure other employment for which

he was fit following his termination from SAC, we cannot say the trial court's conclusion that Miller failed to mitigate his damages is erroneous as a matter of law. Miller's cross issue is therefore overruled.

## CONCLUSION

Based on the foregoing, we affirm the trial court's judgment in all respects.

Catherine Stone, Justice