COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| OFFICE OF THE ATTORNEY GENERAL OF TEXAS, | § | No. 08-14-00054-CV |
| | § | |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | County Court at Law No. 6 |
| | § | |
| LAURA G. RODRIGUEZ, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC#2010-1710) |
| | § | |

## O P I N I O N

Laura G. Rodriguez sued her former employer, the Office of the Attorney General of Texas (OAG), for retaliatory discharge under the Texas Whistleblower Act. *See* TEX. GOV'T CODE ANN. §§ 554.001-.010 (West 2012). The trial court rendered judgment on the jury's verdict and awarded Rodriguez actual damages and attorney's fees. The OAG appeals, contending that (1) the evidence was legally and factually insufficient to support the finding that Rodriguez' whistleblower report was a "but for" cause of her termination, and (2) Rodriguez failed to mitigate her damages and was therefore not entitled to an award of "front pay" damages. We affirm.

### BACKGROUND

Rodriguez began her career with the OAG Child Support Division (CSD) in El Paso, beginning in 1982. Over the years, Rodriguez held a variety of positions with the CSD, and was

ultimately promoted in March of 2005 to become the CSD Regional Administrator (RA) over the entire El Paso Region, known as Region 8. As the RA, Rodriguez was responsible for managing all 145 employees who worked in the seven offices in the Region, which included offices in El Paso, Midland, and Odessa. Each office performed a different function and had an office manager for whom Rodriguez was responsible for directly supervising.

Rodriguez was hired for the RA position by Charles Smith, who at the time was the Deputy Director of the Child Support Division, working in the OAG's headquarters office in Austin; as the Deputy Director, Smith was responsible for overseeing all nine CSD Regions in the State and was Rodriguez's immediate supervisor. During her tenure as RA, Smith evaluated Rodriguez's performance annually, beginning in September of 2005, and gave her outstanding evaluations for her performance, until she received her final evaluation in December of 2009. In addition, under her leadership, Region 8 performed exceptionally well, and was recognized as one of the leading regions in the State of Texas for output.

### The Whistleblower Report

Rodriguez's whistleblower report centered on an email that her executive assistant, and long-time friend, Debbie Galindo had sent to Carol King, an OAG benefits specialist, in December of 2008, requesting that Annika Macias be placed on her insurance as her dependent, stating that Annika was her then 24-year-old niece who had recently moved into her home. When Rodriguez, who explained that she and Galindo shared access to each other's email accounts, viewed the email, she became concerned that Galindo might be committing insurance fraud, as she had personal knowledge that Annika was not Galindo's niece, and that she was instead the girlfriend

2

of Galindo's son, Christopher Galindo.[1]   Moreover, Rodriguez was also personally aware that Annika and Galindo's son had signed a six-month lease on a house owned by Rodriguez's sister in August of 2008, and she therefore did not believe that Annika was residing with Galindo at the time she sent the email.

Rodriguez, believing that she had a duty to report her suspicion of insurance fraud in accordance with the OAG's Fraud Waste and Abuse Prevention Program (FWAPP) policies, reported the matter to Smith.[2]   Smith testified that his first reaction to the report was to question why Rodriguez had been viewing Galindo's email, advising her that he did not typically look at other employee's emails.   Smith testified that he thereafter asked Rodriguez not to make a report, and asked her to instead contact Galindo to seek clarification of what had occurred, despite the fact that the FWAPP policy manual expressly provides that a reporting employee should not confront a suspected individual, or conduct any additional investigation on her own.[3]   Rodriguez advised Smith that she did not wish to confront Galindo, and that she instead wished to report her concerns anonymously, as was her right to do under the FWAPP policy manual, which provides that reporting employees are entitled to confidentiality and to have their identity "protected from

---

[1] Galindo testified at trial that she was aware that as her supervisor, Rodriguez had access to her emails.

[2] The OAG's FWAPP program, formerly known as the Agency Integrity Program, was created in 2004, after then-Governor Rick Perry issued an executive order in which he asked state agencies to implement programs to prevent fraud, waste, and abuse in state agencies.   The FWAPP policy manual provides that "[a]ny employee who becomes aware of fraud, waste, or abuse has a responsibility to see that it is properly reported…."   The policy manual defines "fraud" as a "deception made for personal gain," or "personal benefit," which includes "a benefit for someone else, such as a family member [or] friend[.]"   The FWAPP policy manual provides that a report may be made to an appropriate division chief, as well as the OAG's Ethics Advisor, Director of Human Resources, or the Employee Ombudsman.   Smith acknowledged that, as a division chief, he was an appropriate person to whom to make a report under the FWAPP policies.

[3] The FWAPP policy manual expressly provides a list of acts to "avoid" after reporting a possible FWAPP violation, which includes contacting the suspected individual to gain additional information, attempting to conduct an investigation, and discussing the matter with coworkers.

3

disclosure to the extent possible." Smith, however, testified that he found her reluctance to not want to confront Galindo to be "odd," and admittedly questioned her about why she was refusing to do so. At the time, Rodriguez advised Smith that she did not want the report to interfere with her working relationship with Galindo, but failed to disclose to Smith that she had a long-time friendship with Galindo, and that Rodriguez's sister had been renting a home to Galindo's son and Annika.

Although the OAG's FWAPP policy manual provides that reports made to a division chief, such as Smith, must be "promptly referred to the [OAG's] Ethics Advisor," Smith admittedly did not report the matter to the Ethics Advisor; instead, on January 5, 2009, Rodriguez made an anonymous phone call to Henry De La Garza, the agency's Ethics Advisor, reporting her suspicions. When De La Garza first received the information, he believed that Galindo may have committed a crime when she sent her email to King, such as insurance fraud or providing false information on a government document, and he referred the matter to the OAG's Criminal Investigations Division (CID) for review.

**The Galindo Investigation**

For reasons that are unclear from the record, the CID did not begin its investigation until approximately three months later, in March of 2009, at which time a CID investigator interviewed Galindo about her email. During her interview, Galindo admitted that Annika was not her niece, but was instead her son's girlfriend. She informed the investigator, however, that she unintentionally named Annika as her niece, explaining that she had previously enrolled a niece on her insurance two years earlier when the niece had moved in with her while she was attending college in El Paso. Based on this information, the investigator concluded that Galindo had

4

provided "false information" in her email to King regarding her relationship to Annika, and that Annika did "not meet the requirements to be a dependent eligible for enrollment." The investigator further noted that Annika had already made a claim on Galindo's insurance.

When De La Garza received that report in May of 2009, he believed it was "incomplete" for two reasons. First, he believed the report did not conclusively establish that Galindo was not entitled to enroll Annika as a dependent "child" on her insurance, correctly believing that if Annika was under 25 years of age, and had been living with Galindo as her dependent, Galindo could have enrolled Annika as a dependent child, regardless of whether Annika was her niece or not. Second, De La Garza believed that Galindo may have unintentionally described Annika as her niece, given the excuse she provided to the investigator. On May 18, 2009, De La Garza therefore made a "suggestion" that the CID investigators conduct a second investigation to determine where Annika had been residing during the relevant time periods, as well as Galindo's intent in sending her email to King.

Before that investigation began, however, while Rodriguez and Smith were meeting on an unrelated matter in late June of that year, the two discussed the status of the CID investigation. Smith did not, and he therefore made inquiries to De La Garza and to Jo Kirkel, an attorney in the OAG's HR division, about the matter, and learned of De La Garza'a concerns that Annika might have been living with Galindo and could therefore be claimed as her dependent. When Smith communicated that information to Rodriguez, she advised Smith that she did not believe Annika was residing with Galindo; Smith thereafter sent a follow-up email to Kirkel on June 30, 2009, to relay that information to her. On that same day, Kirkel spoke with De La Garza and a CID officer about the matter, and it was agreed that a second investigation would be initiated.

5

A second investigator thereafter interviewed Galindo, who again insisted that Annika had moved into her house in December of 2008 before she sent her email to King. During this interview, Galindo explained that although Annika and her son had been renting a house from Rodriguez's sister during the relevant time period, Annika had moved out of the house, and into her household with the couple's young child, because they were having health issues due to a mold issue in the house, while Christopher stayed behind in the rental house. Galindo also claimed that she provided Annika with living expenses, including food and gas money, while she was living with her. The investigator also interviewed Annika and Christopher, both of whom confirmed Galindo's version of the events. In addition, the investigator interviewed Rodriguez's brother-in-law, who was unable to confirm or deny that Annika had left the residence in December.

Rodriguez was also interviewed during the second investigation, and informed the investigator that she had no ownership in the house in which Annika and Christopher had been living, but that she had shown the couple the house on her sister's behalf in August of 2008 when they signed their lease, and that she and her husband had communicated with the couple thereafter about the plumbing problems in the house during the months of November and December of 2008, after which Rodriguez's sister and her husband took over responsibility for managing the property. In addition, Rodriguez testified that she had an arrangement in which Annika and Christopher gave their rent payment to Galindo, who in turn gave the money to Rodriguez, who then gave it to her sister. Rodriguez further advised the investigator that although the original rental payment was set at $700 in the lease, during the last three months of their lease, the couple only paid her sister $500 a month in rent to "compensate" for the plumbing and consequent mold problems in the house. And finally, Rodriguez also volunteered to the investigator that she had been renting a

6

home that she and her husband owned to Galindo's daughter during this same time period.

In July of 2009, the investigator provided De La Garza with a summary of his findings, and reported that he could not make a conclusive determination regarding Annika's residence during the relevant time period, but that he nevertheless believed there was "sufficient evidence" to demonstrate that Annika could properly be claimed as Galindo's dependent. However, the investigator did conclude that Galindo had made a false statement in her email when she stated that Annika was her niece.

De La Garza interpreted the findings to mean that Galindo had not committed fraud and had not violated the agency's FWAPP policies; however, he did conclude that Galindo had made a false statement in her email to Carol King, when she stated that Annika was her niece; he conveyed his opinion to Smith, Kirkel, and the OAG's human resources director, John Poole, by email dated July 31, 2009.[4] Thereafter, Smith made a recommendation to suspend Galindo for five days, which was approved by Alicia Key, who at the time was the Deputy Attorney General for Child Support, and was Smith's immediate supervisor.[5]

### Rodriguez's Alleged Management Issues

In August of 2009, before Galindo received her suspension, Smith initiated an investigation into various issues he believed existed with regard to Rodriguez's performance as the RA for Region 8. Smith testified that he made this decision in part because he had received two anonymous letters from Rodriguez's management staff complaining about her management style.

---

[4] In addition, De La Garza testified that upon receiving this report, he became concerned about Rodriguez's financial relationship with Galindo, and spoke with Kirkel about that issue. Kirkel informed him that she believed Rodriguez should be investigated for that relationship, but De La Garza testified that he was not involved in any such investigation.

[5] Smith filled this position when Key retired, and held that position at the time of trial.

7

The first letter had been received in November of 2007 from one of Rodriguez's staff members, expressing the opinion that Rodriguez was too controlling and threatening. Smith had admittedly already spoken to Rodriguez about that letter in January of 2008, and had accepted her explanation that it was likely from one of her office managers, Erika Picos, who Rodriguez believed was upset with her because Rodriguez had recently been critical of her performance.[6] Smith also led Rodriguez to believe that he did not give much credence to anonymous letters, but encouraged Rodriguez to take steps to address the situation with Picos. Thereafter, Smith provided Rodriguez with a positive annual evaluation on that issue in September of 2008, commenting positively on the manner in which Rodriguez handled the situation, noting that it was her first management challenge of this nature since she took over the RA position in 2005, and that she rose to the occasion in addressing the issues she faced.

Smith testified that he received a second anonymous letter in July of 2009, claiming that employees were leaving their employment with Region 8 because of Rodriguez, and that Rodriguez had been continuing to harass and threaten her staff. In addition, Smith testified that he had earlier in the year received at least one exit survey from a disgruntled employee, who also complained about Rodriguez's employment style. Smith believed that these complaints were beginning to show a "pattern" of poor management on Rodriguez's part and testified that this changed his prior positive opinion about Rodriguez's abilities to manage the Region.

### The August 2009 Investigation Against Rodriguez

Smith testified that he did not personally have time to conduct the investigation, and he

---

[6] As well, Rodriguez suspected that Picos was jealous of her, as Picos had unsuccessfully applied for the RA position in 2005 when Rodriguez was hired for the job.

therefore sent two of his assistant deputy directors, Dalia Perez and Mara Friesen, to meet with the various office managers in Rodriguez's region to look into the complaints. After conducting interviews with Rodriguez's staff, Perez and Friesen concluded that Rodriguez's management team believed she was "overly critical and smothering," and they no longer had confidence in her ability to treat them well, or to run the Region. Perez and Friesen met with Rodriguez on August 13 or 14, 2009, to discuss their findings and concerns with her.

During that meeting, they discussed the anonymous complaints that Smith had received complaining about her management style, and brought up the ongoing conflicts that she had with Picos and other employees in the region. In addition, they brought up the fact that Rodriguez had not yet filled an Office Manager position that the Region had in Office 807, which was primarily tasked with performing case intake, after its office manager, Victor Alba, retired in February of 2009; in particular, they criticized her for allegedly trying to handle the manager duties for that office on her own after Alba's retirement while still trying to perform her duties as the RA.

Perez and Friesen also brought up the matter involving the Galindo investigation, and criticized Rodriguez for her business relationship with Galindo's family, advising her that they believed it was inappropriate for her to rent to her employees' family members. Rodriguez recalled that when she tried to advise them that her relationship was not inappropriate, Perez and Friesen appeared to not be listening to her, which prompted her to become emotional and to start crying. Perez and Friesen thereafter reported back to Smith their negative findings about Rodriguez's management style, and their belief that Rodriguez had recently been exercising bad judgment, particularly with respect to her business relationship with Galindo; in addition, they reported that Rodriguez became "irrational" when they tried to discuss the impropriety of that

9

relationship with her.

**Smith's Request to have Rodriguez Administer Discipline to Galindo**

Shortly thereafter, at Smith's request, Perez informed Rodriguez that, as Galindo's supervisor, she was required to write a disciplinary report against Galindo imposing the five-day suspension on her, and that she was to personally administer the discipline to Galindo. Rodriguez followed Perez's instructions and drafted the requested disciplinary report, which she emailed to Perez on August 31, 2009. In her email, however, Rodriguez advised Perez that she thought it was inappropriate for her to be involved in disciplining Galindo, citing the FWAPP's policy that a reporting employee should not be "privy to details or other information gathered during an investigation[.]" In addition, in her email, Rodriguez expressed concern that the agency was not following its own policy in simply suspending Galindo for what she believed was fraudulent conduct, pointing out that the agency's FWAPP policy manual provides that "[t]ermination is the most probable disciplinary action when fraud or criminal activity is found." Rodriguez apparently received no response to the email.

Smith testified that he found it "strange" that she did not want to be involved in the disciplinary proceedings, as she was Galindo's supervisor, explaining that he did not believe that the FWAPP policy manual applied to the situation, in light of the investigator's finding that no insurance fraud had occurred.[7] Smith further suspected that Rodriguez may have been unwilling to administer discipline to Galindo due to her conflict of interest and financial ties with Galindo,

---

[7] Key also testified that she found it "odd" that Rodriguez refused to administer discipline to Galindo, as she believed that Rodriguez had previously administered discipline to her employees in the past. Moreover, Key explained that she did not consider Rodriguez to be a "whistleblower" at that time, even though Rodriguez had reported potentially illegal conduct, and even though Key, who was an attorney, professed to be familiar with the Whistleblower Act.

10

and therefore believed that those ties were interfering with her job duties. And finally, he testified that because Rodriguez had delayed in disclosing her financial ties to Galindo until the second investigation occurred, he believed this "cast doubt" on the credibility of Rodriguez's whistleblower report itself.

## Smith's Request to Demote Rodriguez

During this same general time period in August of 2009, Rodriguez contacted Smith and told him that she wanted to discipline one of her staff members, Greg Wills, for an issue that Smith believed Wills had received a written warning about from Rodriguez earlier in the year.[8] Smith believed that this request was improper, as an employee could not receive discipline for an issue for which he had already received a warning. He therefore concluded that this was another example of Rodriguez exhibiting poor judgment in her management decisions.

On September 4, 2009, Smith drafted his first written request for Rodriguez's termination, which went through several revisions, concluding with a final draft on September 10, 2009. Smith's Request for Termination referenced the staff complaints that Smith had received with regard to Rodriguez's management style, including the November 2007 anonymous letter; the August investigation, which revealed that Rodriguez had management issues; Rodriguez's failure to timely replace the Office Manager for Office 807 when the former manager, Alba, retired in February or March of 2009; her attempts to run that office on her own, which he believed interfered with her ability to perform her RA duties; and Rodriguez's request to provide additional disciplinary action to Greg Wills. In addition, the Request for Termination described the Galindo

---

[8] There was evidence, however, that Rodriguez made this request because of additional performance issues that occurred after the warning was given.

11

investigation at length, and referred to Rodriguez's request not to administer disciplinary action to Galindo, which Smith characterized as being "strange." In the Request, Smith also expressed his mistaken belief that Rodriguez had leased property to both Galindo's son and daughter, and concluded with his opinion that when "managers enter into business relationships with subordinates and/or their children, it shows a lack of judgment because the arrangement can compromise their ability to effectively perform all of the duties of their position."

After reviewing the request for termination, Kirkel advised Smith that she believed Rodriguez should be demoted rather than terminated, based on the agency's treatment of a similarly-situated RA in Dallas, who was demoted rather than terminated for similar performance issues. Thereafter, on September 17, 2009, Smith made a written Request for Demotion, in which he stated that Rodriguez's "management style continues to generate complaints," and that she had "failed to make sound decisions and created a conflict of interest which inhibits her ability to fully discharge her management responsibilities." Smith attached an "Employee Performance/ Disciplinary Report" to the Request, in which he referred to the complaints he had received about Rodriguez's management style during the last three years, as well as the Region's "high turnover rate among its management staff." The report further stated that Smith had made numerous attempts to counsel Rodriguez about her management issues, and that he had instructed her to "refrain from personally running offices when management vacancies occur" (apparently referring to the vacancy in the 807 office), but that Rodriguez's performance had continued "to fall short." The Request concluded with a statement that Rodriguez was being demoted as the "result of [her] recent actions and a subsequent discovery of a conflict of interest involving one of [her] direct

12

subordinates[.]"[9]   Key recalled that she approved the Request for Demotion based primarily on Smith's concerns about Rodriguez's management style.

### Rodriguez's "Voluntary" Demotion to the Office Manager Position

On September 22, 2009, Rodriguez sat in on a meeting in her office in El Paso, in which Smith and Perez administered the five-day suspension to Galindo.   After Galindo received her discipline and left the office, Smith began to speak with Rodriguez about the management problems he perceived she was having in her role as RA.   Rodriguez recalled that Smith advised her that he was there to remove her as the RA, and that she asked if she could request a "voluntary" demotion; however, Smith claimed that he never got that far in the conversation before Rodriguez advised him that she was under a lot of stress both at work and at home, asked if she could take for a "voluntary" demotion.   In any event, Smith agreed to the request for a voluntary demotion, and initially offered Rodriguez a position as the manager for the call center—an office in which Rodriguez had previously worked—but Rodriguez asked if she could take the position that had been left vacant upon Alba's retirement in Office 807.   Because her request was considered voluntarily, Smith was not required to, and did not, share the demotion memo with her at that time.

The next day, Smith provided Rodriguez with an oral warning regarding the complaints he had previously received about her, which was memorialized in an Employee Disciplinary Report. In addition, Smith brought up the "conflict of interest" he believed she had with Galindo, and cautioned her to avoid business relationships with her employees in the future.   At Smith's direction, Rodriguez started her position as the Office 807 manager the next day, September 23,

---

[9] We note, however, that at trial, De La Garza testified that because Rodriguez's relationship was with a family member and not with the subordinate herself, the relationship did not technically violate any OAG policy in existence at that time, and did not create a conflict of interest.

13

2009.[10]

Rodriguez testified that she was unable to focus all of her attention on her new job initially because she was required to draft annual evaluations for her former staff, and perform other "close out" tasks with regard to her RA position, which took her through the month of October of 2009. Rodriguez testified that she realized in November that the office had a significant backlog of unopened cases, and other cases that had not yet been transferred to the appropriate office. Before the new RA was hired, she primarily worked with Smith, who made changes in staff to the office, which Rodriguez believed slowed down the office's progress and prevented the office from meeting targeted goals.

Thereafter, when Oneida Duberney, the new RA for the region started in January of 2010, Duberney made additional changes in procedures in the office, and immediately began making repeated requests of Rodriguez for information pertaining to the backlog and the number of cases awaiting to be opened and transferred, assigning one of Rodriguez's staff members, Jeff Brewer, to assist her with that task; according to Rodriguez, these changes and constant demands also hindered her ability to successfully manage the office.

### Rodriguez's Request to Investigate Smith for Retaliation

In the meantime, on December 22, 2009, Rodriguez received her final annual evaluation for her performance as the RA for the fiscal year ending in September of 2009. The evaluation generally praised Rodriguez's knowledge, talent, and abilities, and stated that she exceeded performance standards in various categories, and that the Region's performance exceeded standards in terms of meeting performance goals and measures during the 2009 fiscal year. The

---

[10] Rodriguez suffered a 29.8% salary decrease due to the demotion, with her salary being reduced from $8,925 a month down to $6,872.25 a month.

14

evaluation also stated that Rodriguez met "Most Standards" with respect to her "Leadership and Decision Making," and "Communication" with her staff, but criticized her for her failure to "connect" with members of her management team "throughout her tenure as the RA." The evaluation also stated that during that fiscal year, Smith had "several complaints" about Rodriguez from management staff, as well as anonymous letters regarding her communication style. The evaluation further stated that during the "summer months," Rodriguez had "made a series of mistakes and missteps," but did not state what those mistakes or missteps were. And finally, the evaluation stated she did not meet the standards set forth in the category of "Standards & Ethics," stating that "it was revealed during an investigation of another employee," that Rodriguez had entered into a "business arrangement" with a subordinate's family member, which he believed "cast doubt" on Rodriguez's "initial complaint" and created a "conflict of interest," which he believed kept her from "administering a disciplinary action against the employee."

Rodriguez prepared a "rebuttal" to the evaluation, which she sent to Smith, as well as to OAG ombudsman, Grace Meyer, and the OAG's human resources director, John Poole, on January 3, 2010. In her rebuttal, Rodriguez asserted that Smith had made various false statements in the evaluation, including his statement that she had management issues "throughout [her] tenure as the RA," noting that she had previously received positive evaluations from Smith in this category in her four prior evaluations as RA. In addition, she argued that she never received any formal complaints or grievances from her staff during her tenure as RA, and pointed out that she was never disciplined for any of the listed management issues. Rodriguez also complained that Smith never specified what "mistakes" or "missteps" she had allegedly made during the summer months of 2009, and asked for additional information about those matters.

15

And finally, Rodriguez addressed the fact that Smith had called her credibility into question in making her report about Galindo's email, pointing out that she made her report in accordance with the OAG's FWAPP policies, and that her relationship with Galindo and/or her family had nothing to do with her decision to make the report. In addition, she asserted that her request not to administer disciplinary action to Galindo was not due to any conflict of interest, and was instead also made in accordance with FWAPP policies that prohibited her from doing so. She concluded by asserting that she was a valued and respected employee before she made her report about Galindo, and claimed that she thereafter became a "target" of management; she further asserted that Smith's poor evaluation of her constituted "retaliation" for her report of suspected illegal activity, and she requested a prompt investigation into that matter.[11]

Rodriguez thereafter sent an email to Poole, dated January 29, 2010, which she copied to Meyer, expressly requesting that a "fair and prompt investigation be conducted to look into [her] claim of retaliation" against Smith. Poole thereafter forwarded Rodriguez's email to Kirkel that same day, and also sent copies of the email to De La Garza, Meyer, and Smith. Kirkel responded to Rodriguez by email dated February 16, 2010, stating that she would like to meet with Rodriguez later that month with regard to her claim of retaliation.

Meanwhile, Rodriguez hired an attorney to assist her with obtaining an investigation into her claim of retaliation. On February 17, 2010, Rodriguez's attorney sent a letter to Poole, explaining that she had been retained to represent Rodriguez regarding "various issues with her employment, including claims of discrimination and retaliation." In her letter, Rodriguez's

---

[11] Smith did not respond directly to Rodriguez's claim of retaliation or her request for an investigation, and instead, advised Rodriguez that if she wished to receive additional information with regard to any matters that were contained in his evaluation, she could do so by contacting the Agency's Public Information Coordinator, who was responsible for handling all requests for public information held by the OAG.

16

attorney objected to Kirkel's offer to meet with Rodriguez about her claim of retaliation, noting that Kirkel had been involved in the Galindo investigation, which was "the subject of [Rodriguez's] current complaints," and asked that another investigator be assigned to the matter. On February 19, 2010, Poole referred Rodriguez's attorney to Grace Meyer, the OAG's ombudsman.

## The Ombudsman Complaint

On March 11, 2010, Rodriguez's attorney filed a written complaint on Rodriguez's behalf with the Ombudsman, claiming that Smith had discriminated against her and that he had taken "retaliatory action" after she filed her report about Galindo's "illegal conduct."[12] In her Ombudsman complaint, Rodriguez once again asked that a "full investigation be conducted by an independent, objective and fair investigator," into her complaints of retaliation. In addition, as explained in more detail below, Rodriguez claimed that she was being subjected to "harassment" by OAG by the new RA, Oneida Duberney, and asked that such harassment "immediately cease and desist."[13]

Rodriguez and her attorney thereafter had a telephone conference with Meyer on March 24, 2010, at which Meyer requested additional documentation of Rodriguez's claim that she was being harassed by Duberney. Rodriguez's attorney provided Meyer with the requested information on April 2, 2010, which included, among other things, correspondence between

---

[12] The FWAPP manual states that: "Retaliation or harassment against someone who reports a possible FWAPP violation in good faith will not be tolerated and may lead to disciplinary action. Retaliation or harassment should be reported immediately to the Director of Human Resources or the Employee Ombudsman."

[13] In addition, Rodriguez's attorney sent an email to Poole dated March 10, 2010, stating that she was formally invoking Rodriguez's right to "applicable appeal or grievance procedures, pursuant to Texas Government Code §554.006 and any applicable policies of the Office of the Attorney General, to the extent such has not already occurred…" However, the record does not contain any response from Poole.

Rodriguez and Duberney regarding Duberney's multiple requests for information pertaining to the backlog that existed in processing cases in Office 807. On March 30, 2010, Meyer emailed Duberney, asking to speak with her about an "employee situation," and Duberney agreed to meet the next day. The record is silent, however, on whether Meyer and Duberney met.

On April 7, 2010, Rodriguez's attorney emailed Meyer and asked if the OAG intended to conduct an investigation into Rodriguez's complaint. On that same day, April 7, 2010, Meyer issued her decision on Rodriguez's complaint, stating that her recommendation was that the "division action" (apparently referring to her demotion) would remain unchanged. She further expressed her recommendation that Rodriguez should continue to work with Duberney to "resolve differences that may arise." Meyer concluded by stating that if Rodriguez was dissatisfied with her decision, she could request a review from Alicia Key. Meyer's decision, however, did not address Rodriguez's claim that Smith had retaliated against her, or her request for an investigation of that matter.

**Rodriguez's Termination from the Office Manager Position**

The day after Rodriguez filed her Ombudsman complaint with Meyer, Duberney drafted her first request to terminate Rodriguez, which was dated March 12, 2010. The request went through several revisions, ending with her final Request for Termination, signed by Duberney and Morgan on April 7, 2010, and by Smith on April 8, 2010.

In the Request, Duberney listed several reasons for the proposed termination, beginning with two meetings that Rodriguez had missed; Rodriguez's failure to adequately address the various "backlogs" in the office; her failure to meet self-imposed deadlines for addressing the backlog; and her failure to meet the "seven-day order entry time frame," imposed by federal law

18

for opening newly-filed cases. Duberney further explained that she had requested information regarding the number of cases that the office had transferred to other offices in January and February of 2010, and that she believed Rodriguez had improperly inflated those numbers. In conclusion, she stated that she was requesting the termination due to Rodriguez's "continuing failures to (1) effectively assume managerial responsibilities, (2) follow her RA's directives, and (3) adhere to agency policy and procedures are the bases for this request to terminate Ms. Rodriguez, effective immediately."

Key testified that she approved the Request for Termination based solely on her review of the information contained in the Request, and that she did not conduct any independent investigation. Key testified, however, that she did not know at the time she approved the termination that Rodriguez had filed a complaint of retaliation against Smith, and acknowledged that this may have been an important factor for her consideration.[14]

### Rodriguez's Search for a New Job

After her termination, Rodriguez searched for another job with the State of Texas and/or El Paso County with comparable pay for over a year and a half after she was terminated, explaining that she was seeking employment with those governmental entities, as she needed to accrue additional years with one of those entities in order to fully vest in the State's retirement system. However, for a variety of reasons, including the fact that her job skills were highly specialized and only applicable to the child support field, and the fact that she was required to disclose that she

---

[14] The Request for Termination had a space for Key's signature, but it was not signed by her. Although Key admittedly did not sign the Request for Termination, she testified that she reviewed and approved the Request, noting that, although her approval was necessary to terminate Rodriguez, her signature was not required on the termination document.

19

had been terminated from the OAG, she was not immediately able to find a comparable position, and she was instead forced to apply for unemployment benefits.

In October of 2011, Rodriguez applied for a state job at the Texas Tech Clinic, but was told that she did not have the proper experience for that position. She then began volunteering at the clinic in order to get the necessary experience, and shortly thereafter was hired by the clinic in November of 2011 when a position came open; however, the job entailed a significant reduction in salary from her position as office manager. However, she believed it was necessary to take the position, so that she could begin accruing her state benefits again. Rodriguez admittedly discontinued looking for other comparable work after she took that position. Rodriguez, who was 50 years old at the time of trial, further testified that she intended to continue working for the State for several more years in order to increase the amount of her State annuity, and to pay off the various debts her family incurred when she was unemployed.

### Rodriguez's Whistleblower Lawsuit

On May 5, 2010, Rodriguez filed her lawsuit against the OAG under the Texas Whistleblower Act, contending that she was wrongfully demoted from the RA position in September of 2009 and later wrongfully terminated from the Office Manager position in April of 2010, as the result of her report of Galindo's misconduct. However, the trial court dismissed the claim regarding her demotion, as the lawsuit had been filed outside the limitations period for that claim, and we upheld that dismissal in our 2012 opinion. *See Office of Attorney Gen. of Tex. v. Rodriguez*, 420 S.W.3d 99, 101 (Tex.App.--El Paso 2012, no pet.).

Following an eight-day trial on her remaining claim of wrongful termination, the jury found in response to two separate questions that there was a preponderance of evidence to support a

20

conclusion that Rodriguez's whistleblower claim was made in good faith and was the cause of her termination.[15] The jury awarded Rodriguez "back pay" in the amount of $260,000, compensatory damages, including emotional pain and suffering, and other non-economic losses, in the amount of $100,000, and "front pay" in the amount of $275,000. The trial court entered judgment against the OAG in accordance with the jury's verdict, and after the OAG's motions for judgment notwithstanding the verdict and for new trial were denied, this appeal followed.

## DISCUSSION

The OAG raises two issues on appeal. First, the OAG contends that the evidence presented at trial was legally and factually insufficient to prove the causation element of Rodriguez's wrongful termination lawsuit, claiming that the report was not a "but for" cause of her termination. Second, the OAG argues that the evidence did not support the jury's award of "front pay" damages to Rodriguez, as Rodriguez admittedly stopped looking for comparable work after accepting the Texas Tech position, and therefore did not mitigate her damages. We disagree with both arguments.

## Standard of Review

In conducting a legal sufficiency or "no evidence" review, we consider all of the evidence presented at trial in the light most favorable to the jury's findings and indulge every reasonable inference that would support them. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). Our ultimate objective in conducting this review is to determine "whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict." *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014) (quoting *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638

---

[15] As explained below, the OAG appears to concede that Rodriguez's report falls within the purview of the Whistleblower Act, and its only issue on appeal is that the report was not a "but for" cause of her termination.

21

(Tex. 2009)). In reviewing the record, we "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kia Motors Corp.,* 432 S.W.3d at 875 (quoting *City of Keller*, 168 S.W.3d at 827). We will sustain a legal sufficiency challenge or no evidence point of error when: "(1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact." *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998); s*ee also City of Keller*, 168 S.W.3d at 810.

When reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence and will "set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Bus. Staffing, Inc. v. Jackson Hot Oil Serv.,* 401 S.W.3d 224, 235 (Tex.App.--El Paso 2012, pet. denied). In conducting our review under both the legal and factual sufficiency standards, we are mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony, and recognizing that it is within the trier of fact's exclusive province to resolve any conflicts in the evidence. *City of Keller*, 168 S.W.3d at 819.

## CAUSATION UNDER THE WHISTLEBLOWER ACT

The Whistleblower Act prohibits the suspension or termination of "a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE ANN. § 554.002. The Act is intended to "enhance openness in government and compel the State's compliance with

22

law by protecting those who inform authorities of wrongdoing." *See Bates v. Pecos County*, ___ S.W.3d ___, 2017 WL 1164597, at \*2–3 (Tex.App.--El Paso Mar. 29, 2017, no pet.) (citing *Tex. Dep't of Assistive & Rehabilitative Servs. v. Howard*, 182 S.W.3d 393, 399 (Tex.App.--Austin 2005, pet. denied)). Governmental immunity is expressly waived under the Act, and therefore, a governmental entity is liable for damages if the plaintiff establishes a violation of the Act. *See* TEX. GOV'T CODE ANN. § 554.0035 (West 2012); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000); *County of El Paso v. Latimer*, 431 S.W.3d 844, 848 (Tex.App.--El Paso 2014, no pet.).

The elements of a whistleblower claim are "(1) that the plaintiff was a public employee, (2) that the defendant was a state agency or local government, (3) that the plaintiff reported in good faith a violation of law (4) to an appropriate law enforcement agency, and (5) that the plaintiff's report was the but-for cause of the defendant's suspending, firing, or otherwise discriminating against the plaintiff at the time the defendant took that action." *Moore v. City of Wylie*, 319 S.W.3d 778, 783–84 (Tex.App.--El Paso 2010, no pet.) (citing *Guillaume v. City of Greenville,* 247 S.W.3d 457, 461 (Tex.App.--Dallas 2008, no pet.)); *see also Texas Department of Human Services v. Hinds,* 904 S.W.2d 629, 636 (Tex. 1995). A public employee who sues under the Whistleblower Act has the burden of proof to demonstrate the existence of all elements of the action, including causation, by a preponderance of the evidence.[16] *Zimlich,* 29 S.W.3d at 67; TEX. GOV'T CODE ANN. § 554.004(a). The OAG challenges only the causation element of Rodriguez's

---

[16] While the statute does not explicitly require an employee to prove a causal link between the report and the subsequent discrimination, the Supreme Court imposed this requirement in *Hinds* when it held that an employee must demonstrate all elements of the action, including causation, by a preponderance of the evidence. *Hinds*, 904 S.W 2d at 633; *see also Zimlich*, 29 S.W.3d at 67 (to show causation, a public employee must demonstrate that after he or she reported a violation of the law in good faith to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his or her employer that would not have occurred when it did if the employee had not reported the illegal conduct).

23

case, claiming that Rodriguez did not present sufficient evidence to support the jury's verdict on that element.

In order to prove causation under the Whistleblower Act, the plaintiff does not need to prove that her report of illegal conduct was the sole reason for the employer's adverse personnel action against her. *See Hinds,* 904 S.W.2d at 634; *see also Rogers v. City of Fort Worth,* 89 S.W.3d 265, 280 (Tex.App.--Fort Worth 2002, no pet.). Instead, the Texas Supreme Court has announced that the standard of causation in whistleblower and similar cases is that the employer's prohibited conduct would not have occurred when it did if the employer had not engaged in the protected conduct under consideration. *Hinds*, 904 S.W.2d at 636 (concluding that this standard "best protects employees from unlawful retaliation without punishing employers for legitimately sanctioning misconduct or harboring bad motives never acted upon"); *see also Nairn v. Killeen Indep. Sch. Dist.*, 366 S.W.3d 229, 246 (Tex.App.--El Paso 2012, no pet.) (recognizing that in a whistleblower case, the plaintiff must establish that "absent the protected activity, the adverse employment action would not have occurred when it did"); *Azar Nut Co. v. Caille,* 720 S.W.2d 685, 687–88 (Tex.App.--El Paso 1986), *aff'd,* 734 S.W.2d 667 (Tex. 1987) (recognizing that a plaintiff in a wrongful termination lawsuit need not establish that her workers' compensation claim was the sole cause of her termination, and instead need only demonstrate that there was a "causal connection" between her discharge and the claim). We have described this causation standard as being a "but for" causal nexus requirement. *Univ. of Texas at El Paso v. Esparza,* 510 S.W.3d 147, 158–59 (Tex.App.--El Paso 2016, no pet.) (apply "but for" standard to plaintiff's claim under the Texas Commission on Human Rights Act). Under this standard, the plaintiff need not establish that the report was a substantial or principal reason for the adverse employment action,

24

and has instead, stated that the Whistleblower Act does not permit a report "to play any role, however small," in deciding whether to take adverse action against the employee. *Hinds*, 904 S.W.2d at 635; *see also City of El Paso v. Parsons,* 353 S.W.3d 215, 225 (Tex.App.--El Paso 2011, no pet.). When the record contains some evidence to support a finding that an adverse employment decision would not have been taken if the employee did not report the violation, a jury may infer causation. *Parsons*, 353 S.W.3d at 225-26 (citing *Zimlich,* 29 S.W.3d at 68; *Hinds,* 904 S.W.2d at 633). However, a jury cannot infer causation without some evidence to support the finding. *Id*. at 226 (citing *Zimlich,* 29 S.W.3d at 68).

A plaintiff may establish a causal link between the adverse employment action and the plaintiff's report of the illegal conduct by circumstantial evidence, which includes evidence of the following five factors:   (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly-situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Parsons*, 353 S.W.3d at 226 (citing *Zimlich,* 29 S.W.3d at 69). Although the plaintiff need not present evidence of all five factors, evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. *Zimlich,* 29 S.W.3d at 69; *see also Parsons*, 353 S.W.3d at 226 (recognizing that if one or more factors exists, the court may affirm the jury's finding of causation).

We examine each factor separately to determine if Rodriguez presented sufficient evidence to sustain the jury's finding of causation.

## 1. **Knowledge of the Whistleblower Report**

For a plaintiff to show causation in a suit alleging wrongful termination under the Whistleblower Act, the plaintiff must show that the person who took the adverse employment action, i.e., the final decision-maker in the agency, knew of the employee's report of illegal conduct. *See Zimlich,* 29 S.W.3d at 70 (citing *Cont'l Coffee Products Co. v. Cazarez*, 937 S.W.2d 444, 451–52 (Tex. 1996)); *see also Beattie v. Madison County Sch. Dist.,* 254 F.3d 595, 603–04 (5th Cir. 2001) (because the school board was the final decision-maker in the plaintiff's termination, the plaintiff was required to demonstrate that the board knew of the plaintiff's protected activity in order to establish causation). This is because it would be illogical to conclude that an employee was fired because of a report if the final decision-maker did not know the employee made such the report. *Harris County v. Vernagallo*, 181 S.W.3d 17, 25 (Tex.App.--Houston [14th Dist.] 2005, pet. denied) (citing *Zimlich,* 29 S.W.3d at 70).

Initially, the OAG spends much time arguing that Duberney did not know of Rodriguez's whistleblower report when she made her initial request to terminate Rodriguez on March 12, 2010, and that her initial request could not have been not inspired by any retaliatory motives. [17] Rodriguez correctly argues, however, that the OAG's focus on Duberney is misplaced, as both parties agree that Duberney had no authority to make the decision to terminate Rodriguez on her own, and she was therefore not a final decision-maker.

---

[17] The OAG, however, acknowledges that Duberney appears to have learned of the report before she made her final Request for Termination. The OAG points out, however, that because Duberney initially requested Rodriguez's termination at a time when she had no knowledge of the report, thereby establishing that she had no "retaliatory motive" for requesting the termination. As explained above, however, Duberney was not a final decision-maker and therefore her motives are irrelevant.

As discussed in more detail below, Rodriguez contends that both Smith and Key were final decision-makers, who made the ultimate decision to terminate Rodriguez, while the OAG contends that only Key can be considered as such. While that issue becomes important in determining whether we can consider Smith's negative attitude in our analysis, it is unimportant for determining who had knowledge of the whistleblower report, as the evidence clearly demonstrates—and the OAG appears to concede—that both Smith and Key had knowledge of the report prior to Rodriguez's termination. As explained above, Rodriguez reported her suspicions about Galindo to Smith in December of 2008, and he was aware of the report she made shortly thereafter to the Ethics Advisor. In addition, Key testified that although she was aware of the Galindo investigation as early as January of 2009, she learned that Rodriguez had been responsible for making the report sometime in the summer of 2009, well before Duberney made the request to terminate Rodriguez. Therefore, we conclude that this factor weighs in Rodriguez's favor.

## 2. The Expression of a Negative Attitude

Similarly, in determining whether an agency expressed a negative attitude toward a whistleblower report, we must again focus only on the words and conduct of the final decision-makers who ultimately approved Rodriguez's termination.[18] *See, e.g., Vernagallo,* 181 S.W.3d at 28; *see also Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004) ("only final decision-makers may be held liable for First Amendment retaliation employment discrimination" under the Civil Rights Act). As explained above, the OAG argues that we should consider Key to be the one and only final decision-maker, and that we should therefore only consider whether she

_____

[18] As such, we once again find it unnecessary to discuss the OAG's argument that Duberney did not express a negative attitude toward the whistleblower report, as she was not a final decision-maker, and therefore, her attitude is not relevant to our analysis. *Vernagallo,* 181 S.W.3d at 28 (negative statement made by plaintiff's immediate supervisor was irrelevant to the causation analysis where supervisor was not the final decision-maker in plaintiff's termination).

exhibited a negative attitude toward Rodriguez's report. The OAG contends that there is no evidence that Key exhibited a negative attitude toward Rodriguez, and that our inquiry should stop there, as we should not consider Smith's negative attitude in our analysis. Rodriguez, on the other hand, argues that we should consider the attitudes of both Smith and Key in our analysis, as they can both be considered final "decision-makers" who approved her termination. We agree with Rodriguez on this point.

Although there does not appear to be any bright-line definition for the term "final decision-maker," courts have typically identified final decision-makers as those individuals who are responsible for making the ultimate decision to terminate an employee, in contrast to a lower-level supervisor who merely had the power to recommend the termination, or who was not otherwise involved in the actual decision-making process. *See, e.g.*, *Howell v. Town of Ball*, 827 F.3d 515, 526 (5th Cir. 2016) (holding that an employee who merely made the recommendation to the town's board of aldermen to terminate the plaintiff, which in turn was required to vote on the termination, could not be considered the final decision-maker); *see generally City of Fort Worth v. Johnson,* 105 S.W.3d 154, 167 (Tex.App.--Waco 2003, no pet.) (recognizing that the proper focus of inquiry is on the employee who had the "final say" in the plaintiff's termination decision); *see also Wal-Mart Stores, Inc. v. Bertrand,* 37 S.W.3d 1, 10 (Tex.App.--Tyler 2000, pet. denied) (comments made by others may provide some evidence of discriminatory intent if they are, among other things, made by individuals with authority over the employment decision); *Costello v. Bank of Am., N.A.,* No. 14-06-00195-CV, 2007 WL 4303499, at *4 (Tex.App.--Houston [14th Dist.] Dec. 11, 2007, no pet.) (mem. op.) (the fact that an employee who was not involved in the employment

28

decision expressed negative feelings is not evidence that the decision had a discriminatory motivation).

Further, the Texas Supreme Court has indicated that there may be more than one final decision-maker who bore responsibility for making an adverse employment action. *See generally Zimlich,* 29 S.W.3d at 70 (finding that there was no evidence in the record that the "decision-maker or decision-makers" knew about an employee's whistleblower report prior to the adverse employment decision); *Cazarez*, 937 S.W.2d at 451 (circumstantial evidence was sufficient to establish a causal link between plaintiff's termination and filing a workers' compensation claim, where the evidence demonstrated knowledge of the compensation claim by "those making the decision on termination"); *see also Alief Indep. Sch. Dist. v. Perry,* 440 S.W.3d 228, 241 (Tex.App.--Houston [14th Dist.] 2013, pet. denied) (where supervisor met with the two employees who had recommended the plaintiff's termination, and the three of them came to a joint decision to terminate, the jury was entitled to infer that they were all final decision-makers for purposes of terminating the plaintiff).

As explained above, the evidence at trial established that Smith was *not* the person who merely recommended or requested Rodriguez's termination, and that it was instead Duberney who made the recommendation; moreover, the evidence established that Smith and Key were both required to, and did give, approval to the request before it could be finalized. In particular, Smith testified that, as the division chief, he was responsible for providing the "final review and signature" on all requests for termination that are submitted within his division, and that his signature was necessary on the paperwork to terminate an employee within his division, and that he was therefore required to give approval to Rodriguez's termination before it could be finalized.

29

In addition, Smith expressly testified at trial that he and Key at the time were the "ones who make the final determination of whether or not a termination occurs." In fact, even the OAG appears to concede that the termination could only take place with the approval of both Smith and Key. As such, we conclude that both Smith and Key may be considered final decision-makers, and that we may therefore consider Smith's attitude toward Rodriguez's whistleblower report in our analysis.

### *Smith's Attitude Toward the Report*

The OAG argues that even if we were to consider Smith's attitude toward Rodriguez's report in our analysis, we should conclude that Smith did not express a negative attitude toward the report. The OAG argues that, to the contrary, Smith "did nothing but support and encourage Rodriguez to make the report about Galindo," telling her to contact the OAG Ethics Advisor, personally passing information along to the investigators in June of 2009 when the Galindo investigation appeared to have stalled, and personally administering discipline to Galindo based on Rodriguez's report.

We note, however, that while conflicting evidence may have been presented, the evidence supported a reasonable inference that Smith did in fact express a negative attitude toward the report. First, Smith himself testified that when Rodriguez initially approached him about the possibility that Galindo's email constituted insurance fraud, he initially criticized her for reading Galindo's emails; he thereafter admittedly asked Rodriguez *not* to make a report, and asked her to instead contact Galindo to seek "clarification" of what had occurred, despite the fact that this was in clear violation of OAG policy.

In addition, as explained above, Smith thereafter admittedly questioned Rodriguez about why she did not want to confront Galindo about her illegal conduct, testifying that he found this "odd," despite the fact that OAG policy expressly provides that the reporting employee should not confront the suspected individual. Similarly, Smith also questioned Rodriguez about why she wanted to report the illegal conduct anonymously, despite the fact that OAG policy expressly provides for the protection of an employee's confidentiality in making reports. Further, although the FWAPP policy manual requires a division chief to promptly report the matter to the agency's Ethics Advisor, Smith admittedly did not report the matter, and instead, relied on Rodriguez to do so.

In addition, after the Galindo investigation was complete, Smith appears to have again encouraged Rodriguez to violate OAG policy, when he asked her to administer discipline to Galindo. And curiously—even though OAG policy clearly states that a person who reports potential fraud should not be privy to the investigative results of the report—both Smith and Key found it "odd" and/or "strange" that Rodriguez did not want to administer the discipline, and Smith even included this negative expression in his initial September 2009 request to terminate Rodriguez from her RA position. Moreover, Smith himself testified that he had doubts about the credibility of her whistleblower report, and even mentioned that he had doubts about the report in his final evaluation of her, despite the fact that the CID investigation had resulted in a finding that Galindo had lied in her email, as Rodriguez had suspected.

The OAG argues that Smith's statements and conduct—even if negative in nature—fall "far short" of the attitude expressed by other supervisors in cases in which a "retaliatory motive was found," citing several cases in which he believes supervisors made much worse comments,

31

and openly expressed their dissatisfaction with an employee's whistleblower report. *See, e.g.*, *Zimlich*, 29 S.W.3d at 69 (supervisor advised plaintiff was "lucky to have a job at all after the [whistleblowing] incident"); *Tex. Dep't of Criminal Justice v. McElyea*, 239 S.W.3d 842, 856 (Tex.App.--Austin 2007, pet. denied) (supervisor became "very angry" and "red in the face" after learning of the plaintiff's whistleblower report, telling another employee that something needed to be done about the plaintiff, and that the plaintiff needed to "keep his nose out of things not his business"). We note, however, that most employers would not be so careless as to make such overtly negative statements after learning of a whistleblower report, nor do not believe that such obviously egregious statements are required to support a finding of retaliation.

In fact, other courts have held that much more subtle statements and conduct, such as discouraging a plaintiff from making a report, can be sufficient to support a finding that the employer expressed a negative attitude toward the report. *See Hunt v. Van Der Horst Corp.*, 711 S.W.2d 77, 80 (Tex.App.--Dallas 1986, no writ) (finding that supervisor's negative statement to the effect that worker's compensation reports cost the company money could support a finding of a negative attitude toward the filing of worker's compensation claims); *see also Louis v. Mobil Chemical Co.,* 254 S.W.3d 602, 609 (Tex.App.--Beaumont 2008, pet. denied) (recognizing that discouraging an employee from making a worker's compensation claim can be a factor in determining whether the employee had a valid retaliation claim); *Luna v. Daniel Intern. Corp.,* 683 S.W.2d 800, 803 (Tex.App.--Corpus Christi 1984, no writ) (where supervisor expressed reluctance to fill out "paperwork" regarding plaintiff's work-related injury and indicated he did not want company to know about it, the evidence was sufficient to raise a fact issue as to the causal

connection between the plaintiff's discharge and his possible claim for worker's compensation benefits).

In the present case, as set forth above, there was evidence from which the jury could have inferred that Smith had a negative attitude toward the report based on his initial efforts to discourage Rodriguez from filing her whistleblower report, his view that Rodriguez was acting in an "odd" or "strange" manner when she insisted that the agency follow its own procedures in handling the report, and his overt statements questioning her credibility in making the report. As such, we conclude that this factor weighs in Rodriguez's favor [19]

### 3. The Failure to Adhere to Established Policies Regarding Employment Decisions

Rodriguez next describes at least three examples of why she believes the OAG did not follow its own policies in making its employment decisions in her case. First, Rodriguez complains that Key testified that she admittedly did not review Rodriguez's past evaluations or consider her past positive performance in determining whether to demote her from the RA position, despite her testimony that such information could have been a factor in her decision. Second, Rodriguez points out that in his request to demote her from the RA position, Smith complained about management issues that went back at least three years, despite Smith's own testimony that the agency did not typically discipline employees for events occurring outside the current evaluation period. And third, Rodriguez points out Smith mentioned the anonymous complaints

---

[19] In light of our conclusion that Smith was a final decision-maker, and that we can consider his negative attitude in our analysis, we need not consider the parties' argument regarding whether Smith's retaliatory motives could be imputed to Key under a "conduit" or "cat's paw" theory of liability, in which the retaliatory motives of a supervisor recommending termination can be imputed to an innocent supervisor who does not conduct an independent investigation. *See, e.g., Long v. Eastfield College,* 88 F.3d 300, 307 (5th Cir. 1996) (concluding that if an innocent final decision-maker did not conduct his own independent investigation prior to approving the plaintiff's termination, and instead merely "rubber stamped" the recommendation of a supervisor with discriminatory motives, those motives could be imputed to the decision-maker).

he had received about Rodriguez's management style in his request for her demotion, despite Key's testimony that the OAG does not typically discipline its employees for anonymous complaints.

There are at least two problems with Rodriguez's reliance on these issues. First, all of the issues pertain to her claim that she was wrongfully demoted from the RA position—a claim that is no longer before us. Second, Rodriguez has not pointed to any actual policies that the OAG violated when they demoted her and/or when they terminated her; the testimony that she points to, at most, establishes that the OAG had a preference for doing things a certain way, but does nothing to establish an actual policy deviation. *See generally Arismendiz v. Univ. of Texas at El Paso*, 536 F.Supp. 2d 710, 719 (W.D. Tex. 2008) (plaintiff's contention that university failed to follow its policies in disciplining her failed where she presented no evidence of any such policy that was applicable to her case that the university failed to follow). As such, we find that this factor weighs in favor of the OAG.

### 4. **Discriminatory Treatment in Comparison to Similarly-Situated Employees**

As set forth above, in determining whether an agency engaged in retaliatory conduct, the plaintiff may present evidence that the agency treated a similarly-situated employee differently than it did the plaintiff. *Ysleta Indep. Sch. Dist. v. Monarrez,* 177 S.W.3d 915, 917 (Tex. 2005). In a variety of contexts, Texas courts have held that, "[e]mployees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Id.* (employment discrimination case); *see also Parker v. Valerus Compression Services, LP,* 365 S.W.3d 61, 69 (Tex.App.--Houston [1st Dist.] 2011, pet. denied) (retaliatory

34

discharge for filing worker's compensation claim); *Willis v. Nucor Corp.,* 282 S.W.3d 536, 553-54 (Tex.App.--Waco 2008, no pet.) (retaliatory discharge for filing worker's compensation claim).

Rodriguez contends that Jeff Brewer, who replaced her in October of 2010, as the 807 Office Manager, was a similarly-situated employee who received more favorable treatment than she did. In particular, Rodriguez contends that under Brewer's leadership, Office 807 suffered from similar backlogs and similar failures to meet its targeted deadlines, as the office did under her leadership, yet the OAG admittedly gave Brewer a grace period in order to address the backlogs and placed on a corrective action plan—an accommodation not afforded to her—even though he failed to improve, the OAG did not terminate him as it did her, and instead demoted him to another position in the agency.

The OAG argues, however, that Brewer cannot be considered a similarly-situated employee for at least three reasons. First, the OAG contends that despite holding the same job title that Rodriguez did, Brewer had duties assigned to him that were different from those assigned to Rodriguez. In particular, the OAG points to Duberney's testimony that after Rodriguez was terminated, Office 807 was tasked with the additional responsibility of handling "interstate" cases, a responsibility which the OAG claims Rodriguez did not have. We note, however, that the evidence was conflicting on that point, as at least one Office 807 employee, Blanca Madrid, testified that Office 807 had "started the process" of handling interstate cases prior to the time Brewer became the office manager, and that the office was already receiving "interstate" cases while Rodriguez was still the office manager.

Moreover, it is unclear from Duberney's testimony whether or how Brewer's duties or responsibilities changed when the office was given this additional task. In fact, Duberney herself

35

testified that Office 807 was assigned a managing attorney to assist the office with interstate issues during Brewer's tenure as office manager, thereby giving the office more manpower than Rodriguez had during her tenure. More importantly, aside from this one alleged responsibility that was added to the office, the OAG presented no evidence to suggest that the fundamental functions and responsibilities of Office 807 changed in any significant way after Rodriguez was terminated, or that Brewer's responsibilities as office manager differed in any significant way from the responsibilities that Rodriguez had.

Second, the OAG points out that Rodriguez and Brewer had different immediate supervisors when they were disciplined, pointing out that Duberney left the RA position, and was replaced by another RA who "reviewed Brewer's conduct," and made the recommendation to demote him rather than to terminate him when he failed to meet his targeted goals.

We note, however, that while Brewer may have had a different immediate supervisor, the record is clear that the same final decision-makers, i.e., Smith, and Key, who made the decision to approve Rodriguez's termination, also made the decision to approve Brewer's demotion.[20] We note that several of our sister courts have followed the standard set forth by the Fifth Circuit, stating that a plaintiff may establish that another employee is a similarly-situated employee by demonstrating either that the two employees "shared the same supervisor or had their employment status determined by the same person[.]" *See, e.g., Mitchell v. Texas Dep't of Criminal Justice,* No. 02-16-00100-CV, 2017 WL 632906, at *3 (Tex.App.--Fort Worth Feb. 16, 2017, no pet.) (mem. op.) (citing *Lee v. Kan. City S. Ry. Co.,* 574 F.3d 253, 260 (5th Cir. 2009)); *see also Texas*

_____

[20] The record indicates that Smith was the division chief until the week before Rodriguez's trial in October of 2013, when Key retired from her position as Director of Child Support, and Smith assumed that position. Although the record does not clearly indicate when Brewer was demoted, it appears clear that it happened before that transition took place.

36

*State Office of Admin. Hearings v. Birch,* No. 04-12-00681-CV, 2013 WL 3874473, at \*15 (Tex.App.--San Antonio July 24, 2013, pet. denied) (mem. op.); *McKenna v. Baylor Coll. of Med.,* No. 01-15-00090-CV, 2016 WL 1714870, at \*6 (Tex.App.--Houston [1st Dist.] Apr. 28, 2016, no pet.) (mem. op.); *Dallas Indep. Sch. Dist. v. Allen,* No. 05-16-00537-CV, 2016 WL 7405781, at \*10 (Tex.App.--Dallas Dec. 22, 2016, pet. denied) (mem. op.) (citing *Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 893 (5th Cir. 2012)). In light of the clear importance of the final decision-maker's role in determining whether a plaintiff has a valid retaliation case, we believe it is also appropriate to consider whether the same final decision-makers were involved in disciplining both the plaintiff and the comparative employee in determining whether the latter can be considered a similarly-situated employee. Accordingly, since it appears that both Brewer and Rodriguez had their ultimate fate decided by the same final decision-makers, we conclude that this aspect of the test is satisfied.

And third, and finally, the OAG argues that Brewer's misconduct was different than Rodriguez's, and that Rodriguez and Brewer had "different faults" that led to different disciplinary decisions in their cases. We note, however, that the reasons that Rodriguez and Brewer were disciplined were much more alike than they were different.

As explained above, in her Request for Termination, Duberney focused on the fact that Rodriguez had a backlog in the office that she was unable to satisfactorily reduce and that the office was not meeting all of its targeted goals during the seven months that Rodriguez served as manager. And the OAG admits in its brief that this was the primary reason that Rodriguez was terminated. Similarly, in an evaluation that Brewer received in June of 2011 for the period beginning in October of 2010, Brewer was criticized for also failing to satisfactorily reduce the

office's backlog and for failing to meet targeted goals during his first seven months as manager.[21] However, as set forth above, rather than terminate Brewer for those deficiencies, as the OAG did in Rodriguez's situation, the OAG first granted Brewer a "grace" period in which to address those deficiencies, and later demoted him to another position in the agency when he failed to meet the office's goals. Moreover, although the OAG contends that there was evidence presented at trial that Brewer was making inroads in tackling the backlog, thereby presumably entitling him to more favorable treatment than Rodriguez, we note that Rodriguez also presented evidence from an Office 807 employee, Blanca Madrid, who testified that Rodriguez had also been making strides in tackling the backlog as well during her short tenure as the office manager. In addition, in at least one email dated February 1, 2010, sent by Brewer, who at the time was assisting Rodriguez with responding to requests from Duberney for statistical information pertaining to the backlog, Brewer indicated that the office was doing a "great job" in reducing certain backlogs. As well, Duberney herself sent an email to Rodriguez and other office managers on March 24, 2010 (twelve days after she drafted her initial request to terminate Rodriguez congratulating the managers for working together in "clearing the order entry backlog" in the office.

While the OAG may be able to point to differences in what occurred under the leadership of these two employees, this does not dissuade us from finding that their conduct was similar enough to allow them to be considered similarly-situated employees. As our sister court noted in *Willis*, in order to prove discrimination based on disparate discipline, the disciplined and

---

[21] Rodriguez contends that all of her past evaluations were more positive than Brewer's, including her past evaluations from her RA position. As the OAG points out, however, her evaluations from her RA position are not relevant to determining whether the stated reasons for her termination from the Office Manager position were false and/or pretextual. *See generally Herbert v. City of Forest Hill*, 189 S.W.3d 369, 376 (Tex.App.--Fort Worth 2006, no pet.) (finding that evaluations given seven months prior to adverse employment action, stating that plaintiff had adequately performed his job were not sufficient to establish that the stated reasons for the action were false).

undisciplined employees' misconduct must be of "comparable seriousness," yet the conduct need not be precisely equivalent. *Willis*, 282 S.W.3d at 554 (citing *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 n.11, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)). We conclude that the misconduct for which Brewer and Rodriguez were disciplined—failing to clear the offices' backlog and failing to meet targeted goals—were of comparable seriousness and similar enough in nature to meet this standard. As the two employees received quite dissimilar treatment for this same misconduct, we conclude that this factor weighs in Rodriguez's favor.

### 5. Evidence that the Stated Reasons for the Adverse Employment Action Were False

Although Rodriguez concedes that she was terminated primarily due to her allegedly poor job performance, including the backlogs in the office, she points out that Duberney included several other reasons in the Request, which she believes were false, or at the least misleading, painting her as an uncooperative and insubordinate employee. First, Rodriguez points out that Duberney accused Rodriguez of missing two meetings, including the "regional meeting" on January 5, 2010 and the Region 8 Managers Meeting on March 10, 2010.[22] Rodriguez, however, points out that she had well-documented medical excuses for missing both of those meetings, including a doctor's note that excused her from work from January 4, 2010 to January 7, 2010, and FMLA leave forms for Rodriguez to be out of the office from March 10 to March 11, 2010 to assist her elderly mother with a hospital procedure that required an overnight stay. The record reflects that Duberney, as well as Smith, were both aware of Rodriguez's first excused absence before they signed the final Request for Rodriguez's termination. In fact, in her first draft of her

---

[22] In addition, after she missed the March 10 meeting, Rodriguez sent Duberney a request for a copy of the minutes so she could review them.

39

request for termination, Duberney referred to the doctor's note, and intimated that Rodriguez may have forged the note, despite the fact that she did not question Rodriguez about the validity of the note at any time prior to her termination. Interestingly, Durberney included no reference to the doctor's note in her final Request for Termination when criticizing Rodriguez for missing the January meeting. In addition, at trial Rodriguez also testified that she told Smith that she was sick and would be missing the January meeting, and that Smith agreed to pass the information along to Duberney.

We also note that the record reflects that Duberney was aware of the FMLA leave form, which excused her from the March meeting, since Duberney personally approved the leave form. Yet nowhere in her final request for termination does Duberney mention the FMLA leave form when she criticized Rodriguez for missing that meeting.

Although the OAG does not dispute that Rodriguez had valid, medically excused and protected reasons for missing the two meetings, the OAG contends that missing the two meetings was not the primary reason for her termination, and therefore should not be considered in our analysis. We question, however, why the OAG found it necessary to include those reasons in its Request if it did not find them to be significant, and if it were not attempting to paint Rodriguez as an insubordinate employee.

This issue dovetails into the statements made in the Request for Termination indicating that Rodriguez was being terminated because she had failed to follow her "RA's directives," and because she failed to "adhere to agency policy and procedures," again painting her as an uncooperative and defiant employee. We note, however, that the Request did not identify any directives, policies or procedures that Rodriguez failed to follow. Instead, the Request described

numerous occasions on which Duberney asked Rodriguez for information pertaining to the backlog and her failure to meet targeted goals. With one exception in which Rodriguez briefly delayed in responding to an email from Duberney, the record indicates that Rodriguez responded in a timely manner to each and every request made by Duberney, and that she worked diligently to respond to Duberney's request for information in a timely manner, beginning in January of 2010 up until she was terminated in April of 2010. While Duberney may not have been satisfied with the information she received, there was no evidence to indicate that Rodriguez intentionally failed to follow any directives that Duberney gave her. In fact, in at least two emails, dated February 17, 2010, and March 24, 2010, Duberney thanked Rodriguez for her efforts in responding to her requests for information, and for working with the other managers in the region to help clear a portion of the office's backlog. Moreover, we find it significant that Rodriguez testified that Duberney never approached her with any concerns that she had regarding whether she was acting in an insubordinate manner, and never expressed any dissatisfaction with her responses prior to her termination. As such, the jury could have concluded that the OAG's statements to the effect that Duberney had violated Duberney's "directives" and/or that she failed to follow Agency policies and procedures were false and misleading.

And finally, we note that the Request for Termination described Rodriguez as having been the "interim Office Manager" of Office 807 from February through September of 2009, while also acting as the RA for the Region. This, however, was disputed at trial. While Rodriguez admittedly did make attempts to assist that office after Alba retired, she testified that she was not in fact the interim office manager, and there is nothing in the record that indicates otherwise. To the contrary, Blanca Madrid, who worked in Office 807 at the time, testified that there was no

office manager after Alba retired until Rodriguez stepped in as Alba's formal replacement, and that managers from other offices were assisting in running the office at various times. We note that the question of whether Rodriguez served as the "interim office manager" was not insignificant; if Rodriguez had in fact served as the "interim office manager" for almost seven months before she formally assumed the position in September, this would have supported a conclusion that Rodriguez was directly responsible for creating the backlogs in the office that she claims she inherited that September from Alba. As such, the jury could have concluded that this statement was false as well.

The OAG would have us overlook all of the above-described statements, and instead simply focus on the fact that Rodriguez was terminated primarily due to her allegedly poor performance, i.e., her failure to tackle the office's backlog and her failure to meet targeted goals. Further, the OAG claims that Rodriguez has not made any attempt to rebut the claim that she was performing poorly, and therefore did nothing to establish that the OAG's reasons were false or pretextual. We note, however, that Rodriguez did present evidence to rebut the allegation that she was performing poorly as the office manager; as set forth above, she presented evidence that the office was making inroads on the backlog under her leadership, despite evidence that both Smith and Duberney had made changes in the office that she believed had negative impacts on the office's performance, and despite the fact that her own performance was hindered by the requests for information made by Duberney. In addition, Smith himself testified that in March of 2010, shortly before Rodriguez was terminated, the office was meeting three out of four of its targeted performance measures. While the question of whether Rodriguez was performing satisfactorily as the office manager was certainly subject to dispute, the fact remains that the OAG relied on

42

other information in its Request for Termination that was in fact false; as such, we conclude that this factor weighs in Rodriguez's favor and supports an inference that the OAG's primary reason for terminating her, i.e., her allegedly poor performance, was pretextual in nature.

As we have found the existence of four out of five factors in the test for causation, we conclude that there was more than a scintilla of evidence to support the jury's finding that Rodriguez would not have been terminated when she was, but for her whistleblower report; therefore, because the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, the evidence is both legally and factually sufficient to support a finding of causation. *See generally Parsons*, 353 S.W.3d at 226–27 (citing *Zimlich,* 29 S.W.3d at 67; *Hinds,* 904 S.W.2d at 633). Issue One is overruled.

## THE AWARD OF FRONT-PAY DAMAGES

At trial, the jury awarded damages to Rodriguez for both "back pay" and "front pay." The OAG has no quarrel with the back-pay award, but challenges the front-pay award, claiming that Rodriguez failed to mitigate her damages when she took a "relatively low-paying job" in November of 2011, and admittedly ceased her efforts to look for a job with comparable pay to her former position as the 807 office manager.[23] The OAG contends that this Rodriguez should not be entitled to any front-pay damages in the absence of evidence that she made an effort to find comparable work after that time.

### *The Definition of Front-Pay Damages*

---

[23] The OAG points out that the jury's award of $275,000 in front-pay damages appears to have been based on the difference in the salary Rodriguez received at her Texas Tech job in comparison to her salary as Office Manager until the time of her projected reasonable retirement. The OAG does not appear to dispute the jury's mathematical calculations in coming up with that figure, nor does the OAG dispute Rodriguez's decision to not retire. Instead, the OAG's sole argument is that she was not entitled to any award of front-pay damages due to her alleged failure to mitigate her damages by continuing her job search.

43

As a preliminary matter, we note that a wrongfully discharged employee may be entitled to both back-pay and front-pay damages. "Back pay" is defined as those lost wages and benefits that accrue from the date of a wrongful termination through trial. *See Dell, Inc. v. Wise*, 424 S.W.3d 100, 114 (Tex.App.--Eastland 2013, no pet.) (citing *United Servs. Auto. Ass'n. v. Brite*, 215 S.W.3d 400, 401 (Tex. 2007); *Stanley Stores, Inc. v. Chavana,* 909 S.W.2d 554, 563 (Tex.App.--Corpus Christi 1995, writ denied)). Front pay is defined as lost compensation from trial forward until a reasonable retirement age. *See, e.g., Dell, Inc.*, 424 S.W.3d at 114 (citing *Hansard v. Pepsi–Cola Metro. Bottling Co.,* 865 F.2d 1461, 1469 (5th Cir. 1989)); *see also Tex. Com'n on Human Rights v. Morrison,* 346 S.W.3d 838, 851 (Tex.App.--Austin 2011), *rev'd on other grounds*, 381 S.W.3d 533 (Tex. 2012) (front pay is an equitable remedy intended to compensate a plaintiff for future lost wages and benefits); *see generally Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 850, 121 S.Ct. 1946, 1948, 1950, 150 L.Ed.2d 62 (2001) (explaining that front pay is awarded in wrongful termination lawsuits where reinstatement is not an option to compensate for future lost wages as a means of making plaintiff whole in such cases). Due to the somewhat speculative nature of front-pay damages, courts have held that a plaintiff is not required to prove the exact amount of future lost wages, but only facts from which the jury can determine the proper amount. *See Goodman v. Page,* 984 S.W.2d 299, 305 (Tex.App.--Fort Worth 1998, pet. denied) (citing *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712–13 (1943)). In addition, the trier of fact is afforded wide latitude in determining front-pay issues. *Dell, Inc.*, 424 S.W.3d at 114 (citing *Sellers v. Delgado Coll.,* 781 F.2d 503, 505 (5th Cir. 1986)).

In the present case, the jury was properly instructed that back pay includes the amount of wages and employment benefits that Rodriguez would have earned in the past had she not been

subjected to her employer's unlawful conduct, less any wages, unemployment compensation benefits that she received in the interim. The jury was also properly instructed that "front pay" is the amount of wages and employment benefits that Rodriguez "would have earned in the future if she had not been terminated on April 8, 2010 less any wages and employment benefits she could reasonably earn through reasonable effort."[24] The OAG does not challenge the jury instruction, but contends that there was no evidence to support the conclusion that she used reasonable efforts to seek comparable work after she took the position at Texas Tech, or in other words, she failed to mitigate her damages after taking that position.

### *The Plaintiff's Duty to Mitigate Damages*

The general rule as to mitigation of damages in breach of employment suits is that the discharged employee must use reasonable diligence to mitigate damages by seeking other employment. *Gulf Consol. Intern., Inc. v. Murphy*, 658 S.W.2d 565, 566 (Tex. 1983); *see also Am. W. Airlines, Inc. v. Tope,* 935 S.W.2d 908, 915 (Tex.App.--El Paso 1996, writ dism'd as moot) (a wrongfully discharged employee has a duty to mitigate damages by making a good faith effort to obtain and retain employment). This obligation includes looking for employment that is substantially equivalent to the job from which the plaintiff was discharged. *Hertz Equip. Rental Corp. v. Barousse,* 365 S.W.3d 46, 58–59 (Tex.App.--Houston [1st Dist.] 2011, pet. denied) (citing *Alamo Cmty. Coll. Dist. v. Miller,* 274 S.W.3d 779, 791 (Tex.App.--San Antonio 2008, no pet.).

In a wrongful discharge case, mitigation is a defensive issue upon which the defendant bears the burden of proof at trial. *Tope,* 935 S.W.2d at 915; *see also Murphy*, 658 S.W.2d at 566; *Miller,* 274 S.W.3d at 788 (citing *Hygeia Dairy Co. v. Gonzalez,* 994 S.W.2d 220, 224 (Tex.App.

---

[24] The OAG did not object to this instruction, nor does it contend on appeal that it was given in error.

--San Antonio 1999, no pet.)).   Therefore, as the proponent of the failure-to-mitigate defense, the defendant bears the burden of proving that the plaintiff's efforts to obtain comparable employment were wanting.   *See Hertz Equip. Rental Corp.,* 365 S.W.3d at 59 (citing *Tope,* 935 S.W.2d at 915). Once the plaintiff presents evidence that he used reasonable efforts to obtain employment, the defendant must present evidence that substantially similar positions were available for which the plaintiff was qualified, but failed to apply.   *See Barousse,* 365 S.W.3d at 59; *see also Smith v. AS Am., Inc.,* 227 F.Supp.3d 1039, 1042-45 (W.D. Mo. 2016) (once a plaintiff has presented evidence that they engaged in reasonable diligence in his job search, the burden shifts to the defendant to show the availability of comparable positions for which the plaintiff was eligible but did not apply); *see also Ballard v. El Dorado Tire Co*., 512 F.2d 901, 905-906 (5th Cir. 1975) (recognizing the "universal rule" that a defendant in a wrongful termination lawsuit has the burden of proving that similar employment opportunities were available to the plaintiff for which he failed to apply). However, if the defendant establishes that the plaintiff did not make reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment.   *See, e.g., Quint v. A.E. Staley Mfg. Co.,* 172 F.3d 1, 15–16 (1st Cir. 1999) (other courts addressing the issue have uniformly relieved the defendant-employer of the burden to prove the availability of substantially equivalent jobs in the relevant geographic area once it has been shown that the former employee made no effort to secure suitable employment) (internal citations omitted)); *see also Sellers v. Delgado College,* 902 F.2d 1189, 1193 (5th Cir. 1990) (once the "employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment").

Mitigation of damages is ordinarily a question of fact for the jury to decide. *Tope*, 935 S.W.2d at 915 (generally, the reasonableness of plaintiff's actions and efforts to mitigate, are fact questions properly left to the jury); *see also Azar Nut Co. v. Caille,* 720 S.W.2d 685, 687–88 (Tex.App.--El Paso 1986), *aff'd,* 734 S.W.2d 667 (Tex. 1987) (it was up to the jury to decide whether the plaintiff acted reasonably in refusing a job offer from the defendant's affiliate company after her termination). When a jury awards damages in a wrongful discharge case, the defendant has the "difficult task" of demonstrating that it established as a matter of law that the plaintiff failed to mitigate his damages, or that the jury's findings on this issue were so against the great weight and preponderance of the evidence as to be manifestly unjust. *Tope,* 935 S.W.2d at 915 (citing *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex. 1989)).

### ***The OAG did not Meet its Burden of Establishing a Failure to Mitigate***

In the present case, the OAG concedes that Rodriguez exercised reasonable diligence in seeking comparable employment prior to taking her lower-paying job at Texas Tech, but finds it significant that Rodriguez admittedly stopped searching for comparable employment after she took that position. The OAG argues that Rodriguez's decision to take that position and to thereafter cease looking for work absolved them of the duty to present evidence that comparable positions were available for which Rodriguez was qualified but failed to apply after that time.

In support of its argument, the OAG relies first on *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003). In *West*, the plaintiff, who had been a supervisor at a drilling company did not formally apply for any comparable positions after his termination, but did call his former employer on several occasions in an attempt to be rehired by the company. *Id*. at 393-94. The court held that the jury could have reasonably found from this evidence that the plaintiff

47

mitigated his damages by seeking to be rehired. *Id*. at 394. However, the court found it significant that the plaintiff thereafter took a much lower-paying non-supervisory job driving a truck at an hourly wage, and made no effort to seek comparable work after that time. *Id*. The court therefore concluded that he had not mitigated his damages after that time, and was therefore not entitled to receive any back-pay damages after the date on which he took the lower paying job, noting that a plaintiff may not "simply abandon his job search and continue to recover back pay." *Id*. at 393 (citing *Hansard v. Pepsi-Cola Metropolitan Bottling Co*., 865 F.2d 1461,1468 (5th Cir. 1989)).

Although the Court in *West* appears to have absolved the defendant of the need to present evidence that there were comparable jobs available for which the plaintiff did not apply once he ceased his job search, other courts addressing the issue have concluded that when a plaintiff initially engages in a lengthy and diligent search for comparable employment, but later takes a lower-paying job after the search becomes futile, the defendant must still present evidence that the plaintiff could have, but did not, apply for comparable jobs within her geographic region. Thus, in a similar situation, our sister court considered a similar situation in which a plaintiff took a lower paying job after his termination, and concluded that this was sufficient to demonstrate that the plaintiff satisfactorily mitigated his damages, where the defendant presented no evidence that there were other positions available in the job market with higher pay after he accepted that position, for which the plaintiff was qualified and could have applied. *See Barousse* 365 S.W.3d at 59. Other courts addressing the issue have arrived at similar conclusions. *See, e.g*., *Smith*, 227 F.Supp.3d at 1041-45 (plaintiff was entitled to damages award where he applied for hundreds of comparable jobs over a two-year period of time, but eventually stopped searching and eventually obtained a

lower-paying job, where defendant presented no evidence to show the availability of comparable positions for which the plaintiff was eligible but did not apply); *see also Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 502 (8th Cir. 1998) (trial court properly limited award of front-pay damages to plaintiff); *Sellers v. Delgado College,* 902 F.2d 1189, 1194-95 (5th Cir. 1990) (trial court properly denied front-pay damages to plaintiff where she failed to actively seek comparable employment following her termination, and later resigned from a lower paying but permanent position).

We also note that several courts have held that where a plaintiff has engaged in a diligent, but unsuccessful, job search for a reasonable period of time, a plaintiff may be relieved of the duty to continue looking for a comparable job and may instead accept steady employment, albeit at a lower-paying job, where the evidence indicates that it would be futile for the plaintiff to continue the job search. *See, e.g., Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269, 1275 (4th Cir. 1985) (holding that plaintiff was entitled to discontinue his job search, where he had engaged in a year-long job search following his termination, which proved futile, and thereafter accepted a lower-paying steady job with regular wages); *see also Conn v. Am. Nat'l Red Cross*, 149 F.Supp.3d 136, 153–54 (D.D.C. 2016) (denying motion for summary judgment in a wrongful termination case, where a genuine dispute of fact existed as to whether plaintiff was entitled to abandon her eight-month job search proved futile).

In the present case, the only evidence presented on the issue of damages came from Rodriguez's testimony that she engaged in an 18-month long search for a comparable job that proved to be futile, after which she took the lower-paying job at Texas Tech, in order to get back on track with her State pension and to begin paying back the debts she and her family had accrued

49

during the time she was unemployed. If the OAG had wished to prove that Rodriguez was not acting in good faith in taking this position, or that it would not have been futile for her to continue her job search, the OAG could have presented evidence that there were in fact comparable jobs available to Rodriguez for which she failed to apply during the relevant time period. However, the OAG presented no evidence of the availability of positions either before or after she took the Texas Tech position, and we therefore conclude that the OAG failed to meet its burden of establishing that Rodriguez did not mitigate her damages. Issue Two is overruled.

## CONCLUSION

We affirm the trial court's judgment in its entirety.

YVONNE T. RODRIGUEZ, Justice

October 16, 2017

Before Rodriguez, J., Hughes, J., and Larsen, J. (Senior Judge)
Hughes, J., not participating
Larsen, J. (Senior Judge), sitting by assignment

50